IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MARONDA HOMES, INC., | ) | Case No. 11-22418 |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| MARONDA HOMES, INC. OF OHIO, | ) | |
| | ) | Case No. 11-22422 |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| MARONDA HOMES OF CINCINNATI, LLC., | ) | Case No. 11-22424 |
| | ) | |
| Debtor. | ) | |
| | | |
| MARONDA HOMES, INC., et al.,[1] | ) | |
| | ) | Docket No. _____ |
| Movants, | ) | Hearing Date & Time: |
| | ) | _____, 2011, ____(_).m. |
| v. | ) | (EDT) |
| | ) | |
| BANK OF AMERICA, individually and as | ) | Objection Deadline: |
| Administrative Agent for Lenders under | ) | _____, 2011 |
| Amended and Restated Revolving Credit | ) | |
| Agreement dated as of March 8, 2010,[2] | | |
| Respondents | | |

**EMERGENCY MOTION FOR INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. §§ 105 AND 363(C) AND BANKRUPTCY RULES 2002, 4001 AND 9014**

---

[1] The Debtors are Maronda Homes, Inc., Maronda Homes, Inc. of Ohio, and Maronda Homes of Cincinnati, LLC.

[2] The "Lenders" are: Bank of America, N.A., Wells Fargo Bank, N.A., Wachovia Bank, National Association, PNC Bank, National Association, KeyBank National Association, Huntington National Bank, Fifth Third Bank, Regions Bank, BMO Capital Markets Financing, Inc., SunTrust Bank, N.A., Compass Bank (as successor to Guaranty Bank), Compass Bank, Comerica Bank, and U.S. Bank National Association.

Debtors, Maronda Homes, Inc. and its Co-Debtor affiliates, by and through their undersigned counsel, and in support of their Emergency Motion for Interim Order Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. §§ 105 and 363(c) and Bankruptcy Rules 2002, 4001 and 9014 state as follows:

A. Introduction

1. On April 18, 2011 (the "Petition Date"), Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11, U.S.C. § 101, et. seq.

2. Debtors continue to operate their business and conduct their affairs as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

3. Debtor Maronda Homes, Inc. is a Pennsylvania corporation with its primary place of business at 1383 St. Route 30, Clinton, Pennsylvania. Debtor Maronda Homes, Inc. of Ohio is an Ohio corporation and Maronda Homes of Cincinnati, LLC is an Ohio limited liability company. Debtors together with affiliated entities (collectively, "Maronda") are engaged in the residential home construction business.[3]

4. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1335. Venue is proper before this Court in accordance with 28 U.S.C. §§ 1408 and 1409. This Motion constitutes a "core" proceeding within the definition of 28 U.S.C. § 157(b)(2).

---

[3] In addition to the Debtor entities, operations are conducted by other companies that have not filed voluntary petitions, including Maronda, Inc. (sole shareholder of the Debtors), Maronda Homes, Inc. of Florida and Maronda Homes Inc. of Georgia.

5. Debtors are co-borrowers (with other Non-Debtor affiliated Maronda entities) under an Amended and Restated Revolving Credit Agreement dated March 8, 2010 ("Credit Agreement") with Bank of America, N.A., as Administrative Agent and all of the lenders ("Lenders") named in this Motion as Respondents that was entered into pre-petition. The Credit Agreement provided for a total loan commitment of $210,000,000.

6. As of the Petition Date, the amount borrowed or available to fund outstanding letters of credit under the Credit Agreement is approximately $98 million ("Petition Date Bank Debt"). The indebtedness to the Lenders is secured by mortgages on properties of the Debtors and affiliates. The market value of the real estate on which the Lenders hold mortgages was established less than one year ago by independent certified appraisals conducted for the Lenders utilizing appraisers selected solely by them. While the Debtors believe the appraisals are rife with errors that reduced their aggregate value and while subsequent sales of real estate by the Debtors have routinely been at values in excess of those predicted by the appraisals, even the appraisals themselves indicate an aggregate retail value of the mortgaged real estate of $152 million; more than $50 million above the totality of amounts due to the Lenders under the Credit Agreement.

B. <u>Concise Statement of Relief Requested</u>

7. As required by Bankruptcy Rule 4001(b)(1)(B), Debtors set forth a concise statement of the relief requested by this Motion for Use of Cash Collateral.

a). <u>Entities with interest in cash collateral</u>: The three Debtors (in addition to three other operating companies and six other entities that hold title to mortgaged

property) are co-borrowers under the Credit Agreement with the Lenders. The three Debtors are operating entities that have mortgaged the bulk of their real property to the Lenders. Proceeds of sales of the Debtors' properties subject to the mortgages are "cash collateral" in which the Debtors and the Lenders have an interest.

b). <u>Purposes of use of cash collateral</u>: Cash collateral will be used to fund and pay for the ordinary and customary expenses of Debtors' business operations in the same manner and for the same purposes that advances under the Revolving Credit Agreement were used pre-petition. Use of cash collateral will directly increase the value of real estate mortgaged to the Lenders by funding the cost of erecting improvements thereon and/or indirectly support the value of said mortgaged real estate by funding the continuing operations of the Debtors.

c). <u>Material terms of the use of cash collateral</u>: As explained in detail below, the Lenders are substantially over-secured because the current aggregate value of the collateral mortgaged to the Lenders substantially exceeds the Lenders' indebtedness as of the Petition Date by at least $50 million. The material terms of the use of cash collateral are:

(i) Debtors will receive the net proceeds of all sales of Debtors' properties that are mortgaged to the Lenders (*i.e.*, the cash collateral) until such time as the value of the collateral mortgaged to the Lenders equals 105% of the Petition Date Bank Debt plus interest that accrues on said Petition Date Bank Debt post-Petition.

(ii) Thereafter, continued use of cash collateral (and continued receipt and use of net proceeds of sales by Debtors) will be conditioned on Debtors granting or causing to be granted to Lenders additional mortgages on properties with a value sufficient to maintain the aggregate collateral value at an amount equal to 105% the Petition Date Bank Debt;

(iii) To reduce interest cost, Debtors (and their affiliates) will have the right to reduce the principal balance of the Lender's indebtedness

(from cash or proceeds of cash collateral) and to from time to time reborrow amounts up to but not in excess of the amount of the Petition Date Bank Debt, without such paydowns resulting in a permanent reduction in the amount of the Petition Date Bank Debt;

(iv)    Proceeds of use of cash collateral, including any reborrowings, will be used for ordinary and customary operating expenses of the Debtors; and

(v)    The interim authorization for use of cash collateral will be limited to $7 million of sale proceeds and will remain in place until the Court enters an Order after final hearing, and thereafter as set forth in that Order.

d).    <u>Liens, cash payments or other adequate protection</u>. The Lenders will be adequately protected by continuation of pre-petition mortgage liens and the requirement that Debtors deliver, when and if necessary, additional mortgages to maintain the collateral value at an amount not less than 105% of the Petition Date Bank Debt.

e).    <u>Relief requested by this Motion</u>. By this Motion, Debtors request entry of an Interim Order authorizing use of cash collateral on the terms set forth above until such time as this Court can schedule and conduct a final hearing on use of cash collateral. Debtors estimate that the amount of cash collateral that will be available from closings on mortgaged properties of the Debtors in the next 30 days will be in the range of $5-$7 million, which amount will be sufficient to fund Debtors' necessary expenses during that period. Given the substantial amount by which the Lenders are oversecured (by more than $50 million), Debtors will not be required during the Interim Period to provide any additional mortgages to Lenders to maintain the collateral value at an amount well in excess of 105% of the amount of the Petition Date Bank Debt.

C. <u>Background</u>

8.    Maronda is a residential home builder that has been in business since 1972. Family-owned since its inception, Maronda has grown in the last four decades

5

from a small start-up to affiliated companies with substantial operations in Pennsylvania, Florida, Ohio, Kentucky and Georgia.

9. Like every home builder in the United States, Maronda suffered a serious downturn in its business when the mortgage lending crisis rippled through the home construction industry beginning in 2007-2008. Unlike many other home builders which did not survive, however, Maronda was able to weather the consequences of the industry downturn by aggressively managing and reducing its expenses and overhead, consolidating office locations, implementing work force reductions and by substantially adjusting its building and marketing plans. By virtue of these actions, Maronda's business has survived and begun to show signs of improvement: March 2011 was the best sales month for Maronda since the 2009 federally subsidized buyer tax credit expired.

10. For decades, Maronda has had lending relationships with one or more national banking institutions including Bank of America and Wells Fargo Bank. Prior to the downturn and at a time when the home building industry was strong, Maronda established dual credit facilities with Bank of America and Wells Fargo as lead institutions that provided credit on an unsecured basis. Over the entirety of its nearly four decades of existence, no Maronda entity has ever failed to pay on time and in full all interest, fees and principal owed to lenders, including the Lenders. Thus, payments of all interest and fees due under the Credit Agreement (including fees as to which a dispute exists) have been paid to the Lenders in full and on time right up to and including the Petition Date.

11. Beginning in mid-2009, Maronda and the lead institutions, Bank of America and Wells Fargo, had discussions regarding the terms of a revised credit facility. Despite Maronda's unblemished payment history, despite its prompt action to substantially reduce operating costs and despite prior repayments that reduced Maronda's bank debt by more than half, the Lenders nonetheless insisted on a new credit agreement that would substantially increase interest rates and require substantial collateral in the form of mortgages on real estate owned and under development.

12. As had been done throughout its history, Maronda cooperated with the Lenders and the Credit Agreement for the revised single credit facility was executed in March 2010. The delivery of mortgages was to occur thereafter and was subject to completion of appraisals, title insurance requirements, mortgage documentation and related items. After the Credit Agreement was executed and as the initial stages of mortgage documentation process proceeded, disputes arose between Maronda and the Lenders, and it became increasingly apparent to Maronda that the Lenders were refusing to honor promises they had made, were being completely inflexible about the mortgaging process and were making requests that were neither reasonable nor required by the Credit Agreement. The Lenders insisted, moreover, that all this be accomplished at an exorbitant cost to Maronda far above what had been estimated.

13. By September 2010, just months after the mortgage documentation began, the fees charged by the Banks to Maronda were in excess of several million dollars, and the process was not even complete. By then, Maronda had delivered executed mortgages for its properties in Pennsylvania and Ohio, and in some areas of Florida.

14. Maronda sought to address all of these matters as they arose and remained cooperative in its provision of information and delivery of mortgages to the Banks. By September 2010, however, it became apparent to Maronda that a continuation of the mounting substantial costs coupled with the Banks' inflexibility and disregard for the consequences of the process on Maronda and its operations would eventually cause Maronda to trigger financial covenants in its Credit Agreement and result in the Banks' elimination of loans to Maronda combined with pursuit of foreclosure on Maronda's real estate. These actions, if undertaken by the Banks in the face of the continuing depressed real estate markets would have caused a massive damage to Maronda.

15. Instead of careening down that destructive course, Maronda halted the mortgaging process, advised the Lenders that Maronda would not deliver additional mortgages (and the reasons why) and proposed that Maronda and the Lenders arrive at an alternative arrangement. While the Lenders agreed to discussions, they dramatically changed their position regarding Maronda's sale of property subject to the mortgages that had just been entered into. Initially, the Lenders provided a release of lien for each residential property sold by the companies that are now Debtors while allowing the Debtors to retain all net proceeds of closings (net proceeds being the gross purchase price less deductions at closing for deposits paid by the buyer(s), prorated real estate taxes, brokerage commissions, etc.). Beginning in October, 2010 the Lenders required that 100% of net proceeds from sales of mortgaged property be paid to them. While applying this practice, however, the Lenders indicated a willingness to consider material changes to the Credit Agreement that would restore liquidity to the Debtors that was being drained as a result of the new practice of the

Lenders to retain 100% of net closing proceeds. Over a two month period ending in December, 2010, Maronda and the Agents for the Lenders exchanged proposed terms that included as essential elements the Lenders' retention of security in the mortgages it had received, an amortization schedule for the remaining bank indebtedness, allowed additional borrowings by Maronda and agreement on procedures for closings on sales of homes to customers and use of net proceeds by Maronda.

16. Agreement with respect to the terms was in fact reached with the lead institutions Bank of America and Wells Fargo. Because Bank of America and Wells Fargo viewed the revised terms to require the consent of all Lenders in the syndicated credit facility, the terms were presented to all of the Lenders for their consent and approval. This process was initially expected to be complete within four to six weeks, but several delays on the part of some of the Lenders extended the process. While refusing to provide Maronda with details of discussions among the Lenders, the Agent (Bank of America) periodically reported that more time would be necessary and some further concessions on the part of Maronda would be required to achieve a final deal. More time passed and Maronda agreed on further concessions but the process continued to drag while, all the while, the Lenders continued collecting 100% of the net proceeds of sales of mortgaged properties. After several additional delays, the Agent reported that 13 of the 14 banks comprising the Lender Group had agreed to the proposed changes, but combined that report with the "bad news" that one bank -- Huntington Bank -- which represented just 6.7% of the amounts loaned by the Lender Group refused to agree. The Agent further reported that it was important to all of the Lenders that every Lender agree to the proposed changes and that, accordingly, efforts were continuing to pursued Huntington Bank to consent.

17. Numerous subsequent discussions involving Huntington Bank and the Agent or Huntington and Maronda failed to obtain the approval of Huntington Bank or any offer of an alternative proposal by Huntington Bank that would be agreeable to it. In fact, Huntington Bank eventually reported that, short of full repayment, no alternative other than continuing to collect 100% of the net proceeds of the sales of mortgaged properties would be acceptable to it and that it would actually prefer that bankruptcy proceedings be commenced so that its personnel would not need to "waste their time" discussing alternatives to bankruptcy. In what became a classic "Catch-22", 13 of the 14 Lenders indicated they would agree to necessary changes but only if the 14th bank did as well. The 14th bank, thus empowered by the functional equivalent of a veto, demanded either that its portion of the loans under the Credit Agreement be repaid in full or that the Debtors could file bankruptcy proceedings. To complete the "Catch-22", the other Lenders refused to purchase the position of Huntington Bank and refused to allow Maronda to use any of its funds (directly or through the pledge of collateral to another bank) to do so notwithstanding that such an option was expressly permitted by the Credit Agreement.

18. While efforts to end this "Catch-22" continued, Maronda had no access to borrowing, all of the proceeds of sales of the Debtors' properties subject to the mortgages were being taken by the Lenders and applied to reduce their indebtedness and Maronda faced the consequences inherent any time lenders holding security threaten to take action with respect to the assets of a borrower.

19. But for this situation, the recalcitrance of Huntington Bank and the refusal of the Lenders to solve the stalemate and proceed with the revised terms with Maronda, Maronda would be able to pay its debts as they come due. However, given

the situation with the Lenders, the resulting lack of liquidity, absence of credit availability and threatened foreclosure of its assets would lead inevitably to Maronda's inability to pay its debts as they become due. Thus, Debtors were left with no option except to commence these bankruptcy cases.

### D. Basis for Relief

20. The pre-petition loans and advances of credit[4] that were made to the Debtors (and their affiliates) by the Lenders under the Credit Agreement are secured by mortgage liens and security interests in nearly all of the Debtors' real estate[5]. The mortgages on real property owned by Debtors in Pennsylvania and Ohio were recorded in favor of the Lenders at various times within the last year. In addition, mortgages securing $5 million of indebtedness were recorded in 2010 on properties in Florida owned by a non-Debtor affiliate -- Maronda Homes, Inc. of Florida.

21. The aggregate value of the collateral subject to these recorded mortgages is approximately $152 million. That value is based on independent appraisals of the mortgaged properties performed within the last year by certified appraisers selected by the Lenders. The appraised value of $152 million for the mortgaged property is based on projected retail sale values (less the cost to complete construction) as determined by the appraisers chosen by the Lenders. The appraised value does not incorporate higher amounts of actual sales prices from executed contracts and therefore the actual value of the collateral securing the Lenders' indebtedness is more than $152 million.

---

[4] The Credit Agreement also included provision of letters of credit. The Petition Date Bank Debt amount of $99 million includes approximately $90 million of borrowings and $8.8 million of letters of credit (whether drawn or undrawn).
[5] A small portion of real estate owned by the Debtors has not been appraised and/or mortgaged to the Lenders. Obviously, Debtors do not require release of liens from Lenders on properties that are not mortgaged since there is no lien. The net proceeds of such non-mortgaged properties are minor, however, and would not be sufficient to fund Debtors' operations.

22. Based on the appraisals obtained by the Lenders, the value of Debtors' real estate subject to the mortgages in favor of the Lenders exceeds the Petition Date Bank Debt by more than $50 million. Therefore, the Lenders are over secured by at least that amount.

23. In the prior six month period during which the Lenders took 100% of proceeds from the sale of mortgaged properties, approximately 180 sales occurred that yielded proceeds to the Lenders of $33 million. The total loans made under the Credit Agreement by the Lenders on these properties prior to six months ago, however, was only $17.5 million. The difference is accounted for by $7.7 million of cash in which the Lenders had no security interest that was funded by Maronda during the six month period to complete construction, with the balance being due to two factors. The two factors are that the property sold turned out, as Maronda contended it would from the inception of discussions with the Lenders, to be worth more than the appraisals obtained by the Lenders and the gross profit earned by the Debtors with respect to the property sold added to net proceeds.

24. The Debtors do not have access to unsecured credit, with or without an administrative priority, that will allow them to fund their continuing operations. This is so for several reasons. First, the Debtors have continued to pay all of their creditors in full and on time, meaning that they have not built up any reserves as could have occurred by delaying payments. Second, the Debtors are already substantially indebted to their parent company Maronda, Inc. which is not in a position to provide further funding beyond the $7.7 million already provided during the past six months because its remaining cash is required for payment of taxes, to fund the operations of its other subsidiaries, to maintain payments due on other indebtedness owed by the

parent company, to comply with covenants in other loan agreements or contracts to which a parent company is a party, to provide additional amounts that may be required by the Debtors for working capital (based on increased sales) that would exceed amounts that could be funded by use of cash collateral and to provide cash reserves required to continue the overall efforts of the collective companies (including the Debtors) to deleverage and to continue to reduce outstanding indebtedness. No other entity will provide unsecured or secured lending due to the depressed state of the home building industry, the first lien position of Lenders in substantially all of the assets of the Debtors and the refusal of the Lenders to themselves agree on any funding mechanism for the Debtors.

25. Use of cash collateral by the Debtors in a manner that continues to provide adequate protection to the Lenders for the full repayment of all amounts owed is essential to the continuing business of the Debtors for all of the following reasons:

a). Collectively, the Debtors have more than 100 employees whose jobs are entirely dependent upon the continuing operations of the Debtors. Additionally, the Debtors incur indebtedness to third party contractors and subcontractors for the development of land, the construction of homes and the servicing of homes in excess of $5 million per month. Thus, use of cash collateral will not only allow continuation of these payments but, concurrently, will actually increase the value of the mortgaged property by improving them and allowing the continuation of normal business operations.

b). Any interruption in the Debtors' business activities will create delays that will result in breaches of sale contracts for the delivery of homes, the loss of the

services of contractors and subcontractors who may turn to other projects, the loss of potential buyers who will not have the confidence to purchase homes from entities that cannot provide assurance they will be able to deliver and a cumulative loss of reputation and credibility that are the life blood of any entity that sells what is customarily a consumer's largest single asset.

      c). Virtually of the Debtors' homebuyers utilize mortgage financing to close on the purchase of a home from the Debtors. Without an indication that the Debtors will have access to continuing funding to conduct their operations as normal, mortgage lenders could decline to provide final mortgage financing for existing contracts and/or refuse to provide mortgage financing to future buyers.

      d). Maronda has its own mortgage subsidiary that provides mortgage financing to buyers through a combination of a warehouse lending agreement that provides it with initial funding for the purchase of homes together with contractual arrangements with investors that ultimately become the holders of mortgages generated by residential closings. In order to maintain these contractual relationships and lending arrangements in place, it is essential that the warehouse lender and the ultimate investors in mortgages retain the confidence that the Debtors will be able to complete construction and accept new contracts for the purchase of homes.

      e). Ironically, a major challenge to the Debtors' business is the competition presented by foreclosed housing inventory often owned by the self-same Lenders that are parties to the Credit Agreement. The overhang of these foreclosed properties serves as a substantial impediment to the Debtors' pricing power. Thus, it is in many respects the Lenders' own financial difficulties that have created the need for use of

cash collateral in order to prevent the Lenders' own mistakes in imprudent prior mortgage lending from destroying Maronda's own business.

26. By this Motion, Debtors request authorization to use cash collateral on a basis that allows the Debtors to receive the funding they need to pay their ordinary and customary expenses of operation during the bankruptcy proceedings, but that does not eliminate the fully secured position of the Lenders or increase the amount of the Lenders indebtedness as it existed as of the Petition Date. Specifically, Debtors request approval of an Order that directs the Lenders to release the lien of their mortgages at closings on sales of constructed dwellings to customers and authorizes Debtors to receive all of the net proceeds of such sales until such time as the value of the collateral subject to mortgages in favor of the Lenders equals 105% of the indebtedness owed to the Lenders plus post-petition interest thereon. If at any time the collateral value of properties mortgaged to the Lenders (based on the Lenders' appraisals) equals less than 105% of the Lenders' indebtedness, Debtors' continued use of cash collateral would be conditioned on Debtors granting to Lenders first priority replacement liens in real property (for which there exists a current appraisal) sufficient to maintain the Lenders' collateral at a value equal to 105% of the Petition Date Bank Debt.

27. To reduce interest cost, Debtors (and their affiliates) should be authorized to temporarily pay down and reduce the principal balance of the Lender's indebtedness (from cash or proceeds of cash collateral) and to from time to time reborrow amounts up to but not in excess of the amount of the Petition Date Bank Debt. The amounts repaid by Debtors would not be used for any permanent reduction in the amount of the Petition Date Bank Debt, and Debtors could reborrow the

amounts repaid up to the amount of the Petition Date Bank Debt. In this manner, the Lenders' principal indebtedness owed will not at any time be increased above the Petition Date Bank Debt, the Petition Date Bank Debt will remain secured by mortgages having a collateral value of at least 105% of the Petition Date Bank Debt plus post-petition interest thereon, and the future interest cost to the Debtors (and therefore expenses to the estates) will be minimized.

28. Under the Bankruptcy Code, Debtors may use cash collateral to the extent they can demonstrate that Lenders are adequately protected for such use of cash collateral. 11 U.S.C. §363(e),(o). The proceeds from sales of Debtors' real estate and constructed dwelling units thereon constitute "cash collateral" within the meaning of §363(a). Under the Bankruptcy Code, adequate protection may be provided by several means including (1) periodic cash payments; (2) additional replacement liens; or (3) other relief resulting in the indubitable equivalent of the secured creditor's interest. For all the reasons set forth above, the Debtors have met the tests for use of cash collateral in that the Lenders are presently substantially over secured, use of cash collateral will not result in their fully secured position being threatened, use of cash collateral will actually improve the value of their mortgage property as proceeds will be spent in part to continue construction thereon and the value of all of the Debtors' collateral to the Lenders will be enhanced in general by the Debtors' continuing operations.

29. Anticipated net proceeds from the closing of real estate mortgaged to the Lenders will be approximately $5-7 million per month. Accordingly, while the Debtors are ultimately requesting the opportunity to use as much as $50 million in the net proceeds of closings, only 10-15% of this amount will be necessary over the next

month. Accordingly, Debtors request that the Court enter, on an emergency basis, the Interim Order in the form attached hereto granting Debtors use of cash collateral on the terms set forth herein pending scheduling of a final hearing, and that the Court schedule a final hearing on use of cash collateral.

April 18, 2011                                          Respectfully submitted,


*/s/ Joseph F. McDonough*
Joseph F. McDonough, Esquire
jmcdonough@mmlpc.com
PA ID No. 19853

James G. McLean, Esquire
jmclean@mmlpc.com
PA ID No. 37463

Manion McDonough & Lucas, P.C.
Firm ID No. 786
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412-232-0200
Counsel to Debtors