## LOCAL BANKRUPTCY FORM NO. 13

### IN THE UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| In Re: | Maronda Homes, Inc. | Bankruptcy No: | 11-22428-JKF |
| | Maronda Homes, Inc. of Ohio | | 11-22422-JKF |
| | Maronda Homes of Cincinnati, LLC | | 11-22424-JKF |

### DISCLOSURE STATEMENT TO ACCOMPANY DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED AUGUST 12, 2011

☐      Chapter 11 Small Business (Check box only if debtor has elected to be considered a small business under 11 U.S.C. § 1121(e))

Debtor furnishes this disclosure statement to creditors entitled to vote on the plan in the above-captioned matter pursuant to Bankruptcy Code § 1125 to assist them in evaluating Debtors' proposed Chapter 11 plan, a copy of which is attached hereto. Creditors entitled to vote may vote for or against the Plan of Reorganization. Creditors who wish to vote must complete their ballots and return them to the following address before the deadline noted in the order approving the distribution of the disclosure statement and fixing time for return of ballots.

Address for return of ballots:

**c/o James G. McLean, Esquire
Manion McDonough & Lucas, P.C.
Suite 1414 - U.S. Steel Tower
600 Grant Street
Pittsburgh, PA 15219**

I.     Background

1.     Name of Debtor:

**Maronda Homes, Inc.
Maronda Homes, Inc. of Ohio
Maronda Homes of Cincinnati, LLC**

2.     Type of Debtor (individual, partnership, corporation): **Each Debtor is a corporation.**

3.     Debtors' Business or Employment: **Residential home construction.**

4.     Date of Chapter 11 Petition: **April 18, 2011.**

5.     Events that Caused the Filing: **Maronda is a residential home builder that has been in business since 1972. Family-owned since its inception, Maronda has grown in the last four decades from a small start-up to a group of affiliated companies with substantial operations in Pennsylvania, Florida, Ohio, Kentucky and Georgia.**

**Like every home builder in the United States, Maronda suffered a serious downturn in its business when the mortgage lending crisis rippled through the home construction industry beginning in 2007-2008. Unlike many other**

home builders which did not survive, however, Maronda was able to weather the consequences of the industry downturn by aggressively managing and reducing its expenses and overhead, consolidating office locations, implementing work force reductions and by substantially adjusting its building and marketing plans. By virtue of these actions, Maronda's business has survived and has begun to show signs of improvement.

For decades, Maronda had lending relationships with one or more national banking institutions. Prior to the downturn and at a time when the home building industry was strong, Maronda established dual credit facilities with Bank of America and Wells Fargo as lead institutions that provided credit on an unsecured basis. Over the entirety of its nearly four decades of existence, no Maronda entity has ever failed to pay on time and in full all interest, fees and principal owed to lenders, including the Lenders. Thus, payments of all interest and fees due under the Credit Agreement (including fees as to which a dispute exists) have been paid to the Lenders in full and on time up to the Petition Date and since the Petition Date to the present time.

Beginning in mid-2009, Maronda and the lead institutions, Bank of America and Wells Fargo, had discussions regarding the terms of a revised credit facility. Despite Maronda's unblemished payment history, despite its prompt action to substantially reduce operating costs and despite prior repayments that reduced Maronda's bank debt by more than half, the Lenders nonetheless insisted on a new credit agreement that would substantially increase interest rates and require substantial collateral in the form of mortgages on real estate owned and under development.

As had been done throughout its history, Maronda cooperated with the Lenders and the Credit Agreement for the revised single credit facility was executed in March 2010. The delivery of mortgages was to occur thereafter and was subject to completion of appraisals, title insurance requirements, mortgage documentation and related items. After the Credit Agreement was executed and as the initial stages of mortgage documentation process proceeded, disputes arose between Maronda and the Lenders, and it became increasingly apparent to Maronda that the Lenders were not performing commitments they had made, were being completely inflexible about the mortgaging process and were making requests that were neither reasonable nor required by the Credit Agreement. The Lenders insisted, moreover, that all this be accomplished at an exorbitant cost to Maronda far above what had been estimated.

Maronda sought to address all of these matters as they arose and remained cooperative in its provision of information and delivery of mortgages to the Banks. By September 2010, however, it became apparent to Maronda that a continuation of the mounting substantial costs of the process on Maronda and its operations would eventually cause Maronda to trigger financial covenants in its Credit Agreement and result in the Banks' elimination of loans to Maronda combined with pursuit of foreclosure on Maronda's real estate. These actions, if undertaken by the Banks in the face of the continuing depressed real estate markets would have caused a massive damage to Maronda.

Instead of careening down that destructive course, Maronda halted the mortgaging process, advised the Lenders that Maronda would not deliver additional mortgages (and the reasons why) and proposed that Maronda and the Lenders arrive at an alternative arrangement. Agreement with respect to new terms was in fact reached with the lead institutions Bank of America and

Wells Fargo. Because Bank of America and Wells Fargo viewed the revised terms to require the consent of all Lenders in the syndicated credit facility, the terms were presented to all of the Lenders for their consent and approval. This process was initially expected to be complete within four to six weeks, but several delays on the part of some of the Lenders extended the process. While refusing to provide Maronda with details of discussions among the Lenders, the Agent (Bank of America) periodically reported that more time would be necessary and some further concessions on the part of Maronda would be required to achieve a final deal. More time passed and Maronda agreed on further concessions but the process continued to drag while, all the while, the Lenders continued collecting 100% of the net proceeds of sales of mortgaged properties. After several additional delays, the Agent reported that 13 of the 14 banks comprising the Lender Group had agreed to the proposed changes, but combined that report with the "bad news" that one bank -- Huntington Bank -- which represented just 6.7% of the amounts loaned by the Lender Group refused to agree. The Agent further reported that it was important to all of the Lenders that every Lender agree to the proposed changes and that, accordingly, efforts were continuing to pursued Huntington Bank to consent.

Numerous subsequent discussions involving Huntington Bank and the Agent or Huntington and Maronda failed to obtain the approval of Huntington Bank or any offer of an alternative proposal by Huntington Bank that would be agreeable to it. In fact, Huntington Bank eventually reported that, short of full repayment, no alternative other than continuing to collect 100% of the net proceeds of the sales of mortgaged properties would be acceptable to it and that it would actually prefer that bankruptcy proceedings be commenced so that its personnel would not need to "waste their time" discussing alternatives to bankruptcy. As a result of these circumstances, the Debtors were left with no option but to file bankruptcy. The actions of the Lenders had caused Maronda to incur and pay more than $7 million in fees, expenses, title insurance premiums, appraisals, Lender professional fees and increased interest rates for a renewed credit facility that was, in the end, actually available to the Maronda entities for less than 60 days! Notwithstanding the excessive charges, the substantial paydown of outstanding indebtedness and the fact that Maronda had granted the Lenders secured collateral well in excess of the outstanding indebtedness, the Lenders insisted on taking and keeping all proceeds of sales of homes and refused to re-lend any amounts to the Maronda companies. As a consequence, Maronda was forced to dissipate available cash, adjust operations and eventually file bankruptcy. Maronda has suffered and continues to suffer substantial harm and damages from these events including payment of fees and expenses, damage to reputation and market stature, lost sales and lost profits, which damages are continuing and increasing but are estimated to be in excess of $40 million.

6.     Anticipated Future of the Company & Source of this Information and Opinion:

Debtors will emerge from bankruptcy and continue in business with a revised credit agreement in place with most or all of its lenders.

7.     Summarize all Significant Features of the Plan Including When and How Each Class of Creditor Will Be Paid and What, If Any, Liens Will Be Retained By Secured Creditors or Granted to Any Creditor Under the Plan:

The Plan proposes that all classes of creditors be paid in full in accordance the terms of the obligations or as otherwise agreed to by the Debtors and the creditor. With respect to the Secured Lenders, the Plan proposes to pay the

allowed pre-petition claims of Lenders in full which consists of all principal, accrued but unpaid interest and any unpaid fees and expenses through the Petition Date subject to an offset to such amounts of $12 million (the "Offset Amount"). The allowed claims of the Secured Lenders, net of the Offset Amount, are paid in full under the Plan but the claims of the Lenders are impaired because the time for payment is extended from the maturity date of March 12, 2012 under the pre-petition Credit Agreement to September 30, 2014.

Under the Plan, the Lenders are also given the option to participate or not in the exit financing provided that, as a condition to the Debtors' acceptance of the Plan, a majority in number and at least 75% in amount due agree to participate in the exit financing. Lenders electing to participate in the exit financing must agree that their pro rata participation in and share of the commitment under the exit financing will be adjusted upward to encompass the pro rata share of any Lender that does not elect to participate in the exit financing. As consideration for such agreement, for participating in the exit financing and for otherwise incurring the risks and obligations relating to the restructuring of the Credit Agreement, the pro rata portion of the Offset Amount for each Lender electing to participate in the exit financing is reduced to zero.

The Offset Amount is proposed by Debtors in exchange for the agreement by Debtors and non-Debtor Borrowers that are parties to the Credit Agreement to resolve and release their claims against the Lenders. The agreement to accept the application of the Offset Amount to the Lenders' pre-petition claims is made without any acknowledgement by the Lenders of the validity of the claims or any admission of liability. The Plan proposes that the resolution becomes effective as to all Lenders by the vote of "Required Lenders" under Section 10.01 of the Credit Agreement as a result of the Lenders' approval of the Term Sheet dated June 30, 2011 and, additionally, will be made effective by a vote of the Secured Lenders Class in favor of the Plan. Debtors do not propose any changes or modifications to Section 2.14 of the Pre-Petition Credit Agreement. Secured Lenders that elect not to participate in exit financing retain their pro rata share of indebtedness outstanding as of the Petition Date (subject to the Offset Amount) and are paid interest monthly at the non-default rates under the Pre-Petition Credit Agreement, and all unpaid principal and accrued but unpaid interest is payable at maturity on September 30, 2014. Under the Plan, all Secured Lenders retain their pro rata interest in collateral granted by Borrowers as of the Petition Date and will receive their pro rata share of proceeds from sales of property that was mortgaged as of the Petition Date based on the value (at cost) of the collateral as of the Effective Date.

8.   Are All Monthly Operating Statements Current and on File With The Clerk of Court: Yes **X**   No ___

9.   Does the plan provide for release of nondebtor parties? Specify which parties and terms of release.

Yes. The Plan provides for the resolution of all claims (except for those allowed claims to be paid in accordance with the Plan) between and among the Lenders and the Debtors and their non-Debtor affiliates who are borrowers under the Credit Agreement through the Effective Date of the Plan. The Plan provides that if the Plan is confirmed (but not otherwise), the Debtors will release, and will cause the non-Debtor Borrower to release, the Lenders and the Administrative Agent under the Credit Agreement of all

**claims arising out of any circumstances or events that occurred prior to the Effective Date of the Plan.**

10.  Identify all executory contracts that are to be assumed or assumed and assigned.

**All executory contracts of all of the Debtors not previously assumed or rejected prior to the Effective Date will be assumed on the Effective Date.**

11.  Has a bar date been set?   Yes  **X**   No ___
(If not, a motion to set the bar date has been filed simultaneously with the filing of this disclosure statement.)

12.  Has an election under 11 U.S.C. §1121(e) been filed with the Court to be treated as a small business:
Yes _____   No  **X**

13.  Specify property that will be transferred subject to 11 U.S.C. § 1146(c).

**Mortgages of property in Florida, Ohio and Pennsylvania.**

II.    Creditors

   A.    Secured Claims

SECURED CLAIMS

| Creditor | Total Amount Owed (as of Petition Date) | Arrearages | Type of Collateral Priority of Lien (1,2,3) | Disputed (D) Liquidated (L) Unliquidataed (U) | Will Liens Be Retained Under the Plan? (Y) or (N) |
|---|---|---|---|---|---|
| Bank of America, as Administrative Agent, for Secured Lenders | $89,770,348.51* | None | Mortgages on real property in Ohio, Pa. and Florida | Disputed** | Y |
| G.E. Commercial Finance (creditor of Debtor Maronda Homes, Inc. of Ohio) | $3,654,489.82 | $132,216.64 | Mortgage on real property located in Eaton, Ohio | | Y |
| TOTAL | $93,424,838.32 | $132,216.64 | | | |

* Debtors have advised Secured Lenders that pre-petition, the Secured Lenders received $1.1 million in proceeds to which they may not have been entitled because the proceeds were from closings on sales of real estate in which the Secured Lenders had no lien.  The presence or absence of a lien on those properties is being investigated by the Administrative Agent.  If there was not a lien on these properties in favor of the Secured Lenders, the Secured Lenders will need to refund $1.1 million to Debtors before the confirmation date and the claim of the Secured Lenders will be $1.1 million less at the confirmation date.

** Claims giving rise to disputed nature of claim to be resolved and released upon confirmation of the Plan of Reorganization.

   1.    The claims of Secured Lenders are classified as Class 1 claims under the Plan.  The allowed claims of the Secured Lenders in Class 1 for all principal, accrued and unpaid interest, and fees and expenses through the Petition Date are paid in full (net of the Offset Amount).  These claims are impaired because, *inter alia*, the time for payment is extended from the existing maturity date under the Credit Agreement, and Secured Lenders are entitled to vote on the Plan.

   2.    The claim of G.E. Commercial Finance is classified as a Class 2 claim.  This claim is not impaired.

B.    Priority Claims

PRIORITY CLAIMS

| Creditor | Total Amount Owed | Arrearages | Type of Collateral Priority of Lien (1,2,3) | (D) (L) (U)[*] |
|---|---|---|---|---|
| Internal Revenue Service | $8,656,500.00 (plus interest) See Note 1 below | N/A | N/A | U |
| Ohio Department of Taxation* | $-0- See Note 2 below | N/A | N/A | U |
| Pennsylvania Department of Revenue** | $-0- See Note 3 below | N/A | N/A | U, D |
| TOTAL | $8,656,500.00 (plus interest) | $N/A | ------- | -- |

\* Maronda Homes, Inc. of Ohio
\*\* Maronda Homes, Inc.

1.    The claim of the Internal Revenue Service is for $8,656,500.00 (plus interest) for amounts based on a review and audit of a 2006 tax return that was initiated and self-reported by the Debtors and affiliates.  A fuller audit by the IRS showed no other changes or amounts due and the IRS has indicated its agreement with the taxpayers' reporting.  The claim has not yet been finalized by the Internal Revenue Service and is not due and will be paid as permitted under the Internal Revenue Code and applicable rules and regulations.  Cash has been reserved for the payment to the IRS. No other federal and state income taxes are presently due and payable.

2.    The Ohio Department of Taxation had a claim as of the Petition Date against Debtor Maronda Homes, Inc. of Ohio for sales tax due for 2004-2007 in the amount of $2,718,543.00 but which was subject to offset for a refund due for a greater amount for the 2004-2007 tax years.  While the review is not entirely complete, Ohio has agreed that on a net basis the Debtors owe nothing and are due a refund.

3.    The Pennsylvania Department of Revenue had a claim as of the Petition Date against Debtor Maronda Homes, Inc. for sales tax for tax years 2004-2007, which is currently on appeal and no amount is due pending the outcome of the appeal.  The claim relates entirely to the Department's refusal to accept Debtors' electronic payment system documentation and insisting instead on hard copies for every transaction.  Debtor believes the claim is without merit and has sought review of the auditor's determination.

4.    All other tax and priority claims have been paid or will be paid if due before the Effective Date.

---

[*] Disputed (D), Liquidated (L), Unliquidated (U)

## C.  GENERAL UNSECURED CLAIMS

**Maronda Homes Inc. (11-22418 JKF)**

C. Unsecured Claims

| | |
|---|---|
| 1.  Amount Debtor Scheduled (Disputed and Undisputed) | $ 1,138,297.65 |
| 2.  Amount of Unscheduled Claims (Total Proofs of Claims)* | $    192,707.16 |
| 3.  Total Claims Scheduled or Filed | $ 1,247,670.78 |

**\*Based on Proofs of Claim filed through August 10, 2011**
   Total Proofs of Claim filed were eight (8).
Except for disputed claims, all unsecured claims listed in above have been paid or will be paid in accordance with their terms.  A substantial portion of the amount in Paragraph 2 is for an unexpired lease on which Debtor is current and which lease will be assumed at confirmation and therefore the claim will be disallowed or withdrawn at confirmation.  Two of the Proofs of Claim are for lesser amounts than were scheduled and the claims have been paid.

**Maronda Homes Inc. of Ohio  (11-22422 JKF)**

C. Unsecured Claims

| | |
|---|---|
| 1.  Amount Debtor Scheduled (Disputed and Undisputed) | $ 426,275.82 |
| 2.  Amount of Unscheduled Claims (Total Proofs of Claims)* | $ 104,240.21 |
| 3.  Total Claims Scheduled or Filed | $ 530,516.03 |

**\*Based on Proofs of Claim filed through August 10, 2011**
Total Proofs of Claim filed were two (2).  Except for disputed claims, all unsecured claims listed above have been paid or will be paid in accordance with their terms.

**Maronda Homes of Cincinnati, LLC (11-22424 JKF)**

C. Unsecured Claims

| | |
|---|---|
| 1.  Amount Debtor Scheduled (Disputed and Undisputed) | $ 199,772.21 |
| 2.  Amount of Unscheduled Claims (Total Proofs of Claims)* | $  10,232.34 |
| 3.  Total Claims Scheduled or Filed | $  210,103.55 |

* Based upon Proofs of Claim filed through August 10, 2011.
   Total Proofs of Claim filed were five (5).  Except for disputed claims, all unsecured claims listed above have been paid or will be paid in accordance with their terms.  Two of the Proofs of Claim are for lesser amounts than were scheduled and the claims have been paid.

D.      Other Classes of Creditors

1.      Amount Debtor Scheduled (Disputed and Undisputed)        $ N/A
2.      Amount of Unscheduled Claims[1]                          $ N/A
3.      Total Claims Scheduled or Filed                          $ N/A
4.      Amount Debtor Disputes                                   $ N/A
5.      Estimated Allowable Claims                               $ N/A


E.      Other Classes of Interest Holders

6.      Amount Debtor Scheduled (Disputed and Undisputed)        $ N/A
7.      Amount of Unscheduled Claims[1]                          $ N/A
8.      Total Claims Scheduled or Filed                          $ N/A
9.      Amount Debtor Disputes                                   $ N/A
10.     Estimated Allowable Claims                               $ N/A

III.    <u>Assets</u>

ASSETS

| Assets | Value | Basis for Value Priority of Lien | Name of Lien Holder (if any) (Fair Market Value/ Book Value) | Amount of Debtor's Equity (Value Minus Liens) |
|---|---|---|---|---|
| See Note Below | See Note Below | See Note Below | See Note Below | See Note Below |

**NOTE:  Except for sales of property or other disposition of assets in the ordinary course, including sales of constructed dwelling units during the bankruptcy cases and parcels of real estate or lots acquired in ordinary course pursuant to existing agreements, each Debtor continues to own those assets identified on Schedule A and B of the respective Schedules filed by each Debtor listing assets as of the Petition Date.  The Secured Lenders (the only class of creditors other than Equity entitled to vote on the Plan) have been provided with regular and updated financial information and appraisals (including as to assets, property acquisitions and asset dispositions) throughout the bankruptcy cases.**

1.    Are any assets which appear on Schedule A or B of the bankruptcy petition not listed above?  **No.**

If so, identify asset and explain why asset is not in estate: **N/A.**

2.    Are any assets listed above claimed as exempt?  If so attach a copy of Schedule C and any amendments.  **No.**

IV.    SUMMARY OF PLAN

    1.    Effect Date of Plan:  **Upon confirmation**

    2.    Will cramdown be sought?  ____ Yes__**X**__ No **(not currently anticipated).**

    3.    Treatment of Secured **Non-Tax** Claims

| Name of Creditor | Class | Amount Owed | Summary of Proposed Treatment |
|---|---|---|---|
| Bank of America, Administrative Agent | 1 | $89,770,348.51 | Pre-petition claims of secured lenders for principal, accrued but unpaid interest and fees and expenses through the Petition Date will be paid in full (subject to offset for Offset Amount of $12 million) |
|  |  |  |  |
| G. E. Commercial Finance Business Property Corporation | 2 | $3,654,489.82 | All past due principal, accrued interest and late fees will be paid in full on or before the Effective Date and balance of indebtedness will remain subject to and be paid in accordance with existing loan documents, and creditor will retain all liens and security interests. |
|  |  |  |  |
| **TOTAL** |  | $93,424,838.32 |  |

    4.    Treatment of Secured Tax Claims

SECURED TAX CLAIMS

| Name of Creditor | Class | Amount Owed | Summary of Proposed Treatment |
|---|---|---|---|
| Internal Revenue Service | Unclassified | $-0- | Claim will be paid when finalized by the IRS as permitted under the Internal Revenue Code and applicable rules and regulations. See Section II(B), Note 1 above. |
| **TOTAL** |  | $-0- |  |

5.    Treatment of Administrative **Non-Tax** Claims[2]

ADMINISTRATIVE NON-TAX CLAIMS

| Name of Creditor* | Amount Owed | Type of Debt** | Summary of Proposed Treatment and Date of First Payment |
|---|---|---|---|
| Manion McDonough & Lucas | $300,000 (est.) | P | Payment in full after Effective Date or upon approval by Bankruptcy Court |

6.    Treatment of Administrative Tax Claims

ADMINISTRATIVE TAX CLAIMS

| Name of Creditor | Amount Owed | Type of Debt | Summary of Proposed Treatment and Date of First Payment |
|---|---|---|---|
| See Summary of Proposed Treatment column | -0- | N/A | All taxes due before Effective Date have been paid on or will be paid as of Effective Date |

*  Identify and Use Separate Line for Each Professional and Estimated Amount of Payment
** Type of Debt (P=Professional, TD=Trade, TX=Taxes)

7.    Treatment of Priority Non-Tax

PRIORITY NON-TAX CLAIMS

| Name of Creditor | Class | Amount Owed | Date of Assessment | Summary of Proposed Treatment |
|---|---|---|---|---|
| None | N/A | -0- | N/A | All employee wage claims and other non-tax priority claims have been paid in full. |

8.    Treatment of Priority Tax Claims[3]

---

[2]  Include all §503(b) administrative claims.

[3]  Include dates when any §507(a)(7) taxes were assessed.

PRIORITY TAX CLAIMS

| Name of Creditor | Class | Amount Owed | Date of Assessment | Summary of Proposed Treatment |
|---|---|---|---|---|
| See Section II(B) above | Unclassified | -0- | N/A | See Section II(B) above |

9.      Treatment of General Unsecured Non-Tax Claims

GENERAL UNSECURED NON-TAX CLAIMS

| Creditor | Class | Total Amount Owed | Percent of Dividend |
|---|---|---|---|
| All Allowed General Unsecured Claims will be paid in full under the Plan. A large number (in excess of 90%) of the unsecured claims as of the Petition Date have already been paid pursuant to "First Day" Orders entered by the Bankruptcy Court. | 4 | See Section II(c) above | 100% |

10.    Treatment of General Unsecured Tax Claims

## GENERAL UNSECURED TAX CLAIMS

| Creditor | Class | Total Amount Owed | Percent of Dividend |
|----------|-------|-------------------|---------------------|
| N/A | N/A | -0- | N/A |

11**.**    Will periodic payments be made to unsecured creditors?

Yes _____    No __**X**___    First payment to begin _____**N/A**_____

If so:

Amount of each payment (aggregate to all unsecured claimants)
Estimated date of first payment:
Time period between payments:
Estimated date of last payment:
Contingencies, if any:

State source of funds for planned payments, including funds necessary for capital replacement, repairs, or improvements:  **N/A.**

Other significant features of the plan:  **All undisputed, liquidated and non-contingent unsecured claims of Debtors have been paid.**

Include any other information necessary to explain this plan:  **N/A**

V.    <u>Comparison of Plan with Chapter 7 Liquidation</u>

If debtor's proposed plan is not confirmed, the potential alternatives would include proposal of a different plan, dismissal of the case or conversion of the case to Chapter 7.  If this case is converted to Chapter 7, a trustee could be appointed to liquidate the debtor's non-exempt assets.  In this event, all secured claims and priority claims, including all expenses of administration, must be paid in full before any distribution is made to unsecured claimants.

Will the creditors fare better under the plan than they would in a Chapter 7 liquidation?

Yes __**X**___    No _____

Explain:  **This Plan provides for the payment in full in accordance with their terms of all undisputed and allowed general unsecured claims and all such claims have already been paid.  Therefore, all**

general unsecured creditors fare better under the Plan than they would in a Chapter 7 liquidation which, among other things, would engender additional expense, result in liquidation of assets (including largely real property) at substantially lower, distressed values and be without the benefits of resolving disputed claims and litigation.

The Plan meets the requirements for confirmation of the Plan under Section 1129 if the Secured Lenders Class 1 votes to accept the Plan. On that basis, Section 1129(a)(8) will be satisfied because all classes will have either accepted the Plan or not be impaired under the Plan, and Section 1129(a)(10) will be satisfied because at least one impaired class of claims (Class 1) will have accepted the Plan. Section 1129(a)(7) will be satisfied because as to Secured Lenders in Class 1, the only class of creditors (other than Equity) impaired under the Plan, all Secured Lenders whether the holder elects Option A or Option B, fare far better under the Plan than they would in a Chapter 7 liquidation.

Under the Plan, all Secured Lenders retain their pro rata interest in pre-petition perfected collateral and are paid their pro rata share of net proceeds of the sale of the collateral based on its value as of the Effective Date as the real property is improved and sold. Exit Lenders are paid the remaining balance of net proceeds. Amounts received by the Exit Lenders are subject to re-borrowing as permitted by the Exit Facility Agreement. The Lenders are paid their pro rata share of all principal, accrued but unpaid interest and fees due as of the Petition Date less the Lender's pro rata share of the offset amount of $12 million. Each Lender has the option, at its election, to not participate in exit financing (Option A) or to participate in exit financing (Option B) and, if a Lender does elect Option B, then to secure the exit facility and to compensate for the benefits to Debtors and attendant risks to the Lender and the commitment to lend, the Lender is granted additional collateral and its pro rata share of the offset amount is reduced to zero.

The treatment of each Secured Lender under the Plan, whether they choose Option A or Option B, is far better than the Secured Lender would receive in a Chapter 7 liquidation. This is so for several reasons. First, a Chapter 7 liquidation would give rise to additional costs and expenses that would not be incurred under the Plan. These include the fees and expenses of a Chapter 7 trustee, additional professional fees and expenses and the costs of further and continuing bankruptcy court proceedings to administer the case.

Second, in a Chapter 7 liquidation, none of Debtors' trade creditors would continue to provide labor, materials or services to Debtors and all opportunity to add value to the Lender's collateral by improving the Debtors' real property would be lost. In addition, a Chapter 7 liquidation would cause loss of customer confidence and no prospective customers would enter into agreements to purchase homes from a liquidating home builder with the uncertainty of completion and inability to honor warranty claims. Moreover, a stoppage in work as a result of vanishing trade credit would result in claims from customers and current homeowners, further increasing expense and reducing available distributable funds. These would also cause a substantial increase in bond claims and reimbursement claims against Debtors' estates.

Third, liquidation of the Debtors' real property assets in bulk through a Chapter 7 bankruptcy liquidation proceedings would greatly suppress the amounts received from the disposition of the collateral securing the indebtedness to Lenders. The offering of large quantities of similar property in the same markets and the distressed sale return from such a liquidation of Debtors' real estate assets (by far the Debtors' principal assets) without improvement would result in net proceeds (after costs of marketing, site preparation, customary closing costs, etc.) substantially less than the amount to be paid to Lenders under the Plan even for those Lenders that elect Option A and become liable for their pro rata share of the Offset Amount. This would also cause a substantial disruption and destabilization on entire markets, since Debtors are among the largest builders in the markets where they operate and the resulting deflation in property values would harm the asset value of other builders and lenders to those builders.

The negative consequences, moreover, would not be limited to the Debtors but would have a domino effect on the non-Debtor Maronda companies from the cumulative effect of cash drain, reputational damage, loss of common vendors, suppliers and contractors and management distractions.

Fourth, unlike the typical case, these Debtors' estates in a Chapter 7 liquidation would not have any meaningful preference or similar voidable transfer claims that might otherwise augment recovery and distribution for creditors. These Debtors were current with unsecured creditors as of the Petition Date, paid nearly all of their unsecured debt pursuant to "First Day" Orders entered by the Court and all payments of pre-petition debt and payments to creditors since the Petition Date have been in exchange for contemporaneous services and materials of value to the Debtors that went to enhancing the value of the Lenders' collateral.

Fifth, under the Plan, the Lenders receive a release for claims that Debtors and their affiliates have involving damages of approximately $40 million. The release is only effective if the Plan is confirmed and in a Chapter 7 proceeding, therefore, the release would not be given and the Debtors would pursue the claims against the Lenders (which would be for even higher amounts if the result of the Lenders' conduct were ultimately liquidation). Pursuit of those claims in a Chapter 7 proceeding would generate additional cost and expense and delay any distribution to Lenders as compared to the Plan. Finally, although any eventual recovery on the Estates' claims against the Lenders would provide available proceeds, because the claims are against the Lenders, any such recovery would decrease, not increase, the distribution to Lenders and, in all cases whether they elect Option A or Option B under Section 5.01(c) of the Plan, the Lenders would receive substantially less in a Chapter 7 liquidation than they would under the Plan.

VI.    Feasibility

    A.    Attach Income Statement for Prior 12 Months.

    B.    Attach Cash Flow Statement for Prior 12 Months.

    C.    Attach Cash Flow Projections for Next 12 Months.

The Plan provides for exit financing in an amount sufficient to permit Debtors to make all payments required under the Plan and to operate their businesses following consummation of the Plan. The maturity date of the exit financing is the earlier of three years from the Effective Date or September 30, 2014. The Secured Lenders have been provided with financial information relating to Debtors' past performance and projections as Lenders have requested.

Estimated amount to be paid on effective date of plan, including administrative expenses.

        **$333,150.00 (estimated)**

Show how this amount was calculated.

| | |
|---|---|
| $ $300,000.00 | Administrative Class |
| $ -0- | Taxes |
| $ -0- | Unsecured Creditors |
| $ 33,150.00 | UST Fees (Est. for July, August and September) |
| $ 333,150.00 | TOTAL (estimated) |

What assumptions are made to justify the increase in cash available for the funding of the plan?

**Availability of exit financing approved as part of the Plan.**

Will funds be available in the full amount for administrative expenses on the effective date of the plan? From what source?  If not available, why not and when will payments be made?

**Yes, from exit credit facility.**

Cash on hand $     N/A          (Current).  Attach current bank statement.

Cash on hand $     N/A          (Estimated amount available on date of confirmation)

If this amount is less than the amount necessary at confirmation, how will debtor make up the shortfall? **From borrowings under exit credit facility.**

VII.    Management Salaries

MANAGEMENT SALARIES

**No changes to management salaries are proposed as part of the Plan.**

VIII.   Identify the Effect on Plan Payments and Specify Each of the Following:

1.      What, if any, litigation is pending?

**The pending litigation is as identified in each Debtor's Statement of Financial Affairs in response to Question #4.  In addition, claims between and among Debtors and Lenders will be released as part of the Plan of Reorganization if the Plan is confirmed.**

2.      What, if any, litigation is proposed or contemplated?

**Continuation of any litigation that was pending as of Petition Date and not concluded in the interim.  Assuming confirmation of the Plan and release of claims against Lenders, no additional litigation contemplated by Plan.**

IX.     Additional Information and Comments

**None.**

X.    <u>Certification</u>

The undersigned hereby certifies that the information herein is true and correct to the best of my knowledge and belief formed after reasonable inquiry.

If Debtor is a corporation, attach a copy of corporate resolution authorizing the filing of this Disclosure Statement and Plan.

If Debtor is a general partnership, attach a copy of the consent agreement of all general partners to the filing of the bankruptcy.

<table>
<tr><td>s/ Ronald W. Wolf</td><td>08/12/11</td></tr>
<tr><td>Signature of Debtor<br>or Authorized Representative</td><td>Date</td></tr>
<tr><td><br></td><td></td></tr>
<tr><td>Signature of Debtor<br>or Authorized Representative</td><td>Date</td></tr>
<tr><td>_s/ Joseph F. McDonough</td><td>08/12/11</td></tr>
<tr><td>Debtor's Counsel</td><td>Date</td></tr>
</table>

**Corporate Resolution of the Board of Directors**
**of**
**Maronda Homes, Inc.**


The undersigned Ronald W. Wolf is the President and Chief Executive Officer of Maronda Homes, Inc., a Pennsylvania corporation.  On August 11, 2011 the following resolution was duly adopted by the Board of Directors of this corporation.

WHEREAS, the corporation filed a voluntary petition in the United States Bankruptcy Court pursuant to Chapter 11 of the United States Code on April 18, 2011 captioned In re Maronda Homes, Inc., filed at Case No. 11-22418-JKF; and

WHEREAS, it is in the best interest of this corporation to file a Disclosure Statement and Plan of Reorganization in the United States Bankruptcy Court; and

NOW , THEREFORE BE IT RESOLVED, that Ronald W. Wolf, President and Chief Executive Officer of this corporation, be and hereby is, authorized and directed to execute and deliver the Disclosure Statement and Plan of Reorganization in the United States Bankruptcy Court on behalf of the corporation.

DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF A CORPORATION

I, Ronald W. Wolf, Chief Executive Officer of the corporation named as Debtor in the above bankruptcy case, declare under the penalty of perjury that I have read the foregoing resolution and it is true and correct to the best of my knowledge, information and belief.


Date: August 11, 2011                    /s/ Ronald W. Wolf
                                         Ronald W. Wolf, President and Chief Executive Officer

**Corporate Resolution of the Board of Directors**
**of**
**Maronda Homes Inc. of Ohio**


The undersigned Ronald W. Wolf is the Chief Executive Officer of Maronda Homes, Inc. of Ohio, an Ohio corporation.  On August 11, 2011 the following resolution was duly adopted by the Board of Directors of this corporation.

WHEREAS, the corporation filed a voluntary petition in the United States Bankruptcy Court pursuant to Chapter 11 of the United States Code on April 18, 2011 captioned In re Maronda Homes Inc. of Ohio, filed at Case No. 11-22422-JKF; and

WHEREAS, it is in the best interest of this corporation to file a Disclosure Statement and Plan of Reorganization in the United States Bankruptcy Court; and

NOW , THEREFORE BE IT RESOLVED, that Ronald W. Wolf, Chief Executive Officer of this corporation, be and hereby is, authorized and directed to execute and deliver the Disclosure Statement and Plan of Reorganization in the United States Bankruptcy Court on behalf of the corporation.

DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF A CORPORATION

I, Ronald W. Wolf, Chief Executive Officer of the corporation named as Debtor in the above bankruptcy case, declare under the penalty of perjury that I have read the foregoing resolution and it is true and correct to the best of my knowledge, information and belief.


Date: August 11, 2011                       /s/ Ronald W. Wolf
                                            Ronald W. Wolf, Chief Executive Officer

**Corporate Resolution of the Members**
**of**
**Maronda Homes of Cincinnati, LLC**


The undersigned Ronald W. Wolf is the Managing Member of Maronda Homes of Cincinnati, LLC, an Ohio limited liability company. On August 11, 2011 the following resolution was duly adopted by the Board of Directors of this corporation.

WHEREAS, the corporation filed a voluntary petition in the United States Bankruptcy Court pursuant to Chapter 11 of the United States Code on April 18, 2011 captioned In re Maronda Homes of Cincinnati, LLC, filed at Case No. 11-22424-JKF; and

WHEREAS, it is in the best interest of this corporation to file a Disclosure Statement and Plan of Reorganization in the United States Bankruptcy Court; and

NOW , THEREFORE BE IT RESOLVED, that Ronald W. Wolf, Managing Member of this limited liability company, be and hereby is, authorized and directed to execute and deliver the Disclosure Statement and Plan of Reorganization in the United States Bankruptcy Court on behalf of the corporation.

DECLARATION UNDER PENALTY OF PERJURY ON BEHALF OF A CORPORATION

I, Ronald W. Wolf, Managing Member of the company named as Debtor in the above bankruptcy case, declare under the penalty of perjury that I have read the foregoing resolution and it is true and correct to the best of my knowledge, information and belief.


Date: August 11, 2011                    /s/ Ronald W. Wolf
                                         Ronald W. Wolf, Managing Member