IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 11-22418-JKF |
| MARONDA HOMES, INC., | ) | Chapter 11 |
| Debtor. | ) | |
| IN RE: | ) | Bankruptcy No. 11-22422-JKF |
| MARONDA HOMES, INC. OF OHIO, | ) | Chapter 11 |
| Debtor. | ) | |
| IN RE: | ) | Bankruptcy No. 11-22424-JKF |
| MARONDA HOMES OF CINCINNATI, LLC., | ) | Chapter 11 |
| Debtor. | ) | |
| IN RE: | ) | Related to Document Nos. <u>117 & 118</u> |
| MARONDA HOMES, INC., et al., | ) | Hearing Date: <u>October 28, 2011</u> |
| Movants, | ) | |
| v. | ) | |
| NO RESPONDENT. | ) | |

## OBJECTIONS OF THE HUNTINGTON NATIONAL BANK TO DISCLOSURE STATEMENT TO ACCOMPANY DEBTORS' JOINT CHAPTER 11 PLAN OF REORGANZATION AND TO DEBTORS' JOINT PLAN OF REORGANIZATION DATED AUGUST 12, 2011

The Huntington National Bank, by its attorneys, Metz Lewis Brodman Must O'Keefe LLC, files the following Objections to Disclosure Statement to Accompany Debtors' Joint Chapter 11 Plan of Reorganization and to Debtors' Joint Plan of Reorganization Dated August 12, 2011:

1

## BACKGROUND

1. On April 18, 2011, the above captioned Debtors ("Debtors") filed a voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code").

2. Debtors are residential home builders.

3. The Huntington National Bank ("Huntington") is a secured creditor of the Debtors. Huntington is a participant in a syndicated loan facility lead by Bank of America as the administrative agent. The lenders participating in the pre-petition Credit Agreement shall collectively be referred to throughout as the "Lenders."

4. On August 12, 2011 Debtors filed and served a Disclosure Statement ("Disclosure Statement") accompanied by a Chapter 11 Plan of Reorganization ("Plan") for approval to this Court.

5. On August 26, 2011, the Court entered an Order which, among other things, provisionally approved the Debtors' Disclosure Statement and fixed the time by which interested parties must file and serve responses, including objections, to the Disclosure Statement and to confirmation of the Plan.

6. Debtors' Disclosure Statement must be rejected as inadequate and as a result, among other reasons set forth herein, confirmation of the Debtors' Plan must be denied.

A. **OBJECTION TO THE DISCLOSURE STATEMENT: THE DISCLOSURE STATEMENT FAILS TO PROVIDE "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. §1125.**

7. Section 1125 of the Bankruptcy Code provides that a plan may not be submitted to creditors and interest holders unless they receive an accompanying disclosure statement that provides "adequate information" for them to decide whether to accept or reject the proposed plan. *In Re Phoenix Petroleum Co.* 278 B.R. 385, 392 (E.D. Pa. 2001); *In Re Ferritti*, 128 B.R. 16, 18 (Bankr. D.N.H. 1991). The Court in *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3rd Cir. 1988), *cert. denied*, 488 U.S. 967, 109 S. Ct. 495 (1988) stated:

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of "adequate information."

In *Phoenix Petroleum,* 278 B.R. at 392, the Court went on to state that "the general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against the plan."

8. The principle of disclosure is of prime importance to the reorganization process. *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 526 (Bank. N.Y. 1989). The Court and the debtor's creditors rely heavily on the disclosure statement in determining whether to approve the proposed plan. *Ryan Operations G.P. v. Santim-Midwest Lumber Co.,* 81 F.3d 355, 362 (3rd Cir. 1996). Because of this reliance, a disclosure statement must contain **complete, accurate and factual information, not opinions, partial truths, misrepresentations, or silence** to satisfy the Bankruptcy Code standard of 'adequate information.' *See Oneida Motor Freight, Inc. v. United Jersey Bank* 848 F.2d at 417 (emphasis added). Therefore, a party seeking protection under Chapter 11 has "an affirmative duty to provide creditors with a disclosure statement containing adequate information to enable a creditor to reach an informed judgment about the plan."

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corporation*, 337 F.3d 314, 321 (3rd Cir. 2003) (internal quotations omitted).

9. Debtors have submitted a plan which proposes to pay all parties, secured creditors and unsecured creditors alike, in full, *except* for those secured creditors who elect not to participate in additional exit financing. At its heart, the crux of the Plan is to impose a penalty upon each secured creditor which declines to participate in exit financing (a deduction of its pro rata share of an "Offset Amount" (defined in the Plan as "$12 million") from its allowed and fully secured claim), while otherwise treating *all* other parties, secured creditors, unsecured creditors and the equity security holders, without penalty.

10. The explanation for the Offset Amount set forth in Paragraph 5 of the Disclosure Statement amounts to nothing more than a diatribe which focuses on the alleged uncooperativeness of the Lenders (and particularly Huntington) to restructure the parties' credit relationship pre-petition. Debtors' explanation regarding the Offset Amount culminates with profound speculation that not only have the Debtors paid an unnecessary $7 million pre-petition in fees and expenses in an effort to revise the parties' Credit Agreement, but that, in addition, in a court of law, they could prove claims against the Lenders for "damage to reputation and market stature, lost sales and lost profits" amounting to an estimated "$40 million." Disclosure Statement ¶5, Page 3.

11. The information provided regarding Debtors' speculative claims is wholly conclusory and inadequate, providing no meaningful information or documentary support for:

    a. the magnitude of the claims,

    b. the specific bases for the claims,

c. the specific events leading to the claims, including involved parties, actions taken or omitted, dates and times,

d. the specific parties allegedly causing harm and how,

e. the specific parties allegedly harmed,

f. the specific harm resulting to the allegedly aggrieved parties,

g. the calculation of damages,

h. documentation to support damages,

i. an expert opinion regarding liability for damages,

j. an expert opinion for the computation of damages claimed,

k. any rational analysis of the probability of succeeding with such claims, or

l. any basis for concluding that the Offset Amount represents a reasonable settlement of such claims,

Surely this is insufficient.

12. The Offset Amount is derived with no apparent mathematical calculation or expert opinion supporting the alleged claims, the alleged damages or the reasonableness of the Offset Amount, but merely a simple statement that in some hypothetical world the Debtors might compromise and settle their hypothetical claims against the Lenders for $12 Million.

13. In any suit against the Lenders for damages of the kind Debtors so graciously offer to release, the Debtors would need to not only set forth cognizable claims, but demonstrate direct damages and legal causation as a result of the allegedly improper actions of the Lenders.

14. The Disclosure Statement bypasses provision of information supporting the claims, the value of the claims, the likelihood of succeeding with such claims and the

reasonableness of the settlement of such claims in the Offset Amount, all very material to the Debtors' Plan.

15. The information provided by the Debtors in the Disclosure Statement is woefully inadequate. Not a shred of information in the Disclosure Statement provides any support for the claims, the legal bases for the claims, the damages, the computation of the damages, the legal cause of the damages, the likelihood of succeeding with such claims or the reasonableness of the settlement of such claims.

16. The Disclosure Statement does not contain "complete, accurate and factual information" required for approval or necessary to allow proper consideration of the Debtors' proposed Chapter 11 Plan. As such, approval of the Debtors' Disclosure Statement must be denied.

**B.  OBJECTIONS TO THE CHAPTER 11 PLAN OF REORGANIZATION DATED AUGUST 12, 2011**

17. 11 U.S.C. §1129 (a) sets forth the various requirements that must be met in order to obtain a plan confirmation order. *In re Tallahassee Assoc., L.P.*, 132 B.R. 712, 715 (Bankr. WD PA 1991). *See also In Re: Dupell*, 2000 WL 192972 (Bankr.E.D.PA 2000) (*citing In Re Adkisson Village Apartments of Bradley County, Ltd.*, 133 B.R. 923, 925 (Bankr. S.D. Ohio 1991) ("the provisions of 1129(a) of the Bankruptcy Code are mandatory and the Court must find that all have been met prior to confirming a proposed plan of reorganization.")); and *In re H.H. Distributions, L.P., et al.*, 400 B.R. 44, 50 (Bankr. E.D. Pa. 2009).

18. "(E)ven absent an objection, the plan proponent has the burden of showing, and the bankruptcy court has the duty to ensure, that the requirements of §1129(a) are met." *Dupell* at 3 (*citing, In re Union Meeting Partners*, 165 B.R. 553, 574 (Bankr.E.D.PA. 1994), *aff'd* 52 F.3d 317 (3rd. Cir. 1995) (*other citations omitted*).

19. The plan must comply with all applicable provisions of Title 11 of the Bankruptcy Code. 11 U.S.C. §1129(a)(1).

### 1. THE PLAN IS UNCONFIRMABLE BECAUSE IT SEEKS TO TREAT CREDITORS OF THE SAME CLASS DIFFERENTLY IN VIOLATION OF §1123(a)(4)

20. 11 U.S.C. §1123(a)(4) provides that a plan shall: " provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."

21. Debtors have placed each of the fully secured Lenders into Class 1 under the Plan and have offered two options. Option A is for those lenders which elect not to participate in the exit financing and provides that each such lender will be paid its total allowed and fully secured claim *less* its pro rata share of the Offset Amount of $12 million. Option B is for those lenders who elect to participate in the exit financing and provides that each such lender will be paid its total allowed and fully secured claim *without* application of the Offset Amount. Essentially, each lender who opts out of participation in exit financing will suffer the penalty of the application of the Offset Amount to its allowed and fully secured claim and, as a result, will be paid less than the full amount of its allowed and fully secured claim.

22. This proposed treatment clearly violates the requirement that every member of a class be treated equally. 11 U.S.C. §1123(a)(4).

23. Debtors may look to support such disparate treatment by citing to Judge Walrath's decision in the Delaware Bankruptcy Court in the case of *In re Washington Mutual, Inc.* 442 B.R. 314 (Bankr. D. Del.), in which the United States Trustee objected to confirmation of the proposed plan because certain distributions under the plan were contingent on certain members of the class granting a third party release. In *Washington Mutual,* each creditor in the relevant

class was given an option to release third party claims and, in exchange, to receive a distribution under the plan. Those choosing not to give a release retained their option to litigate but would not receive a distribution under the plan. In finding that the treatment was equal within the class, Judge Walrath concluded that the creditors were not treated differently because each was given the same opportunity within the class to be treated equally. Essentially, each such creditor had the option to choose to get paid through the bankruptcy or choose to try for a better result through litigation.

24. The opportunity presented in *Washington Mutual* is fundamentally different than the option provided to the Lenders of Class 1 of the Plan at issue. In the Debtors' Plan, a Lender must give something more (exit financing) to receive full payment of its allowed and fully secured claim – a full payment to which it is already entitled. Simply stated, a lender choosing to stomach only the risk to which the parties contractually agreed is penalized by application of an ambiguous and unfairly determined "Offset Amount." By opting out of the exit financing, a secured creditor is penalized with a reduction in its allowed and fully secured claim, the amount already owed to it by the Debtors. The disparity of this result is exacerbated by the fact that, while each such secured creditor is so penalized, Debtors propose to pay junior classes of creditors 100% of their allowed claims.

25. As a result of the impermissible disparate treatment proposed by the Debtors, confirmation of the Debtors' Plan must be denied.

### 2. THE PLAN HAS NOT BEEN PROPOSED IN GOOD FAITH IN ACCORDANCE WITH §1129 (a)(3)

26. In order to satisfy the good faith requirement of 1129(a)(3), a debtor's proposed plan must provide fundamental fairness in dealing with creditors. *In re Am. Family Enter.*, 256 B.R. 377, 401 (D.N.J. 2000).

27. A court should look at the totality of the circumstances when determining whether or not a plan of reorganization has been filed in good faith. *In re Matter of Sound Radio, Inc.*, 93 B.R. 849 (Bankr. D.N.J. 1988), aff'd in part, remanded in part on other grounds, 103 B.R. 521 (D. N.J. 1989), aff'd 908 F.2d 964 (3rd Cir. 1990). A plan should protect the creditors' rights and provide sufficient payments to the creditors. *In re Cherry* 84 B.R. 134 (Bankr. N.D. Ill., 1988).

28. Debtors' Plan proposes to pay all secured and unsecured creditors in full *excepting* only those secured creditors which opt out of exit financing. Debtors propose to penalize fully secured creditors which opt out of the exit financing by crediting each such secured creditor's allowed and fully secured claim by the creditor's prorata share of the Offset Amount.

29. To propose that all secured and unsecured creditors be paid in full *excepting* only secured creditors who elect not to participate in exit financing clearly demonstrates the Debtors' attempt to penalize such secured lenders and must, as a matter of fact and law, be deemed in bad faith. As such, confirmation of the Debtors' Plan must be denied.

### 3. THE PLAN FAILS TO INCLUDE A COMPLETE CHAPTER 7 LIQUIDATION ANALYSIS IN ACCORDANCE WITH §1129 (a)(7)

30. A Section 1129(a)(7) analysis "requires a comparison between what each member of a class will receive under a plan and what such claimant would receive in liquidation." Stone & Webster, 286 B.R. at 545 (quoting 7 Collier on Bankruptcy ¶1129.03[7][c] p. 1129-48 (15th ed. rev. 2002).

31. Debtors' Plan lacks any analysis at all as to how each creditor will fare in a liquidation scenario. Most importantly, unencumbered assets of the Debtors and related non-Debtors who are borrowers under the Revolving Credit Agreement should be considered in a liquidation analysis. However, no such information is included in the Plan, without which

creditors, including Huntington, are denied the opportunity to make an informed decision as to how much each would receive in a liquidation compared to reorganization. As such, confirmation of the Debtors' Plan must be denied.

### 4. THE PLAN IS NOT FAIR AND EQUITABLE IN ACCORDANCE WITH §1129(b)(1) AS TO HUNTINGTON'S SECURED CLAIM

32. A plan of reorganization must provide that each class either accept the plan or be unimpaired. 11 U.S.C. §1129(a)(8). An exception to this rule allows a plan to be crammed down on a dissenting class of impaired creditors so long as the plan does not discriminate unfairly and is fair and equitable with respect to such dissenting class. "If all of the applicable requirements of (§1129(a))...other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan." 11 U.S.C. §1129(b)(1).

33. For a plan to be fair and equitable as to a secured creditor, it must provide one of three things: (1) that the holder of the claim retain its liens against the property securing the same and receive payment at least equal to the value of such creditor's interest in the estate's interest in such property; (2) for the sale of such property with the creditor's lien attaching to the proceeds of such sale; or (3) for the realization by such creditor of the indubitable equivalent of such claims. 11 U.S.C. §1129(b)(2).

34. Since Debtors intend to retain possession of property against which the Lenders have fully secured liens, Huntington is entitled to retain its lien against the real property and is entitled to receive payment in full of its claim since it is fully secured by such property.

35. Debtors' proposal to reduce payment to Huntington and other similarly situated secured creditors by their prorata portions of the Offset Amount is neither fair nor equitable. As such, confirmation of the Debtors' Plan must be denied.

### 5. THE PLAN VIOLATES THE ABSOLUTE PRIORITY RULE OF §1129(b)(2)(B)

36. Most often, the absolute priority rule ("Rule") arises when a class of unsecured creditors receives less than the full amount owed while a junior class of creditors or other parties in interest receives some type of value. The Rule governs the fair and equitable treatment of unsecured claims. The United States Supreme Court has explained that the Rule requires that a "dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under the plan." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202 (1988).

37. While the Rule may seem inapplicable to the Debtors' Plan because the Debtor proposes to pay all unsecured creditors in full, such treatment is but another alarming feature of the Debtors' Plan. Essentially, any secured creditor which opts out of exit financing suffers a reduction in its allowed and fully secured claim with no further treatment (*i.e.* the reduction is not treated as an unsecured claim). Thus, an allowed and fully secured claim becomes a claim that will *not* be paid in full while unsecured creditors are paid in full and equity security holders retain their ownership without a further investment or loss.

38. There is a fundamental problem in the Debtors' Plan where an allowed and fully secured creditor is paid the equivalent of a partial payment of its claim while remaining unsecured creditors receive full payment and equity security holders retain ownership without additional investment or loss.

39. Debtors' Plan violates the Rule, for which reason confirmation of the Debtors' Plan must be denied.

WHEREFORE, The Huntington National Bank requests that approval of the Debtors' Disclosure Statement be denied and that confirmation of the Chapter 11 Plan of Reorganization dated August 12, 2011 be denied.

*/s/ John R. O'Keefe*
John R. O'Keefe, Jr., Esq.
PA. I.D. No. 36633
Christine A. Saunders, Esq.
PA. I.D. No. 203373
Metz Lewis Brodman Must O'Keefe LLC
11 Stanwix Street, 18th Floor
Pittsburgh, PA 15222
Phone: 412-918-1100
Attorneys for The Huntington National Bank