**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | Chapter 11 |
| MARONDA HOMES, INC., | Case No. 11-22418-JKF<br>(Joint Administration) |
| Debtor. | |
| _____ | Document No. ___ |
| In re: | |
| MARONDA HOMES OF OHIO, | Chapter 11 |
| Debtor. | Case No. 11-22422-JKF |
| _____ | |
| In re: | |
| MARONDA HOMES OF CINCINNATI, LLC, | Chapter 11 |
| Debtor. | Case No. 11-22424-JKF |
| _____ | |
| | Related to Docs. Nos. 117, 118, 162, 163, and 164 |
| | Objection Deadline: October 14, 2011 |
| | Hearing Date & Time:<br>**October 28, 2011 at 9:00 a.m.** |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF**
**APPROVAL OF DEBTORS DISCLOSURE STATEMENT AND**
**CONFIRMATION OF DEBTORS' JOINT**
**PLAN OF REORGANIZATION DATED AUGUST 12, 2011**

Debtors Maronda Homes, Inc., Maronda Homes, Inc. of Ohio and Maronda Homes of Cincinnati, LLC ("Debtors"), by their undersigned counsel, submit this Memorandum of Law in Support of Approval of Debtors' Disclosure Statement and Confirmation of Debtors' Joint Plan of Reorganization Dated August 12, 2011.

**TABLE OF CONTENTS**

Page

I.      Introduction..............................................................................................5

II.     Background ..............................................................................................7

III.    Description Of The Plan .........................................................................8

IV.     Ballot Results ........................................................................................12

V.      Status Of Proofs Of Claim ...................................................................12

VI.     The Plan Meets All The Requirements of Section 1123 and
        1129 of The Bankruptcy Code And Should Be Confirmed........................13


        A.      The Plan Meets the Contents Requirements of Section 1123 ...........13

                1.      The Plan Makes Proper Classification of Claims as
                        Required by 11 U.S.C. §§ 1122 and 1123(a)(1).....................13

                2.      Specification of Unimpaired Classes (11 U.S.C.
                        § 1123(a)(2)) ..........................................................................14

                3.      Specification of Treatment of Impaired Classes (11
                        U.S.C. § 1123(a)(3)) ...............................................................14

                4.      No Discrimination (11 U.S.C. § 1123(a)(4) ..........................14

                5.      Implementation (11 U.S.C. § 1123(a)(5)) ............................15

                6.      Selection of Officers and Directors (11 U.S.C.
                        § 1123(a)(7)) ..........................................................................15

                7.      Additional Provisions (11 U.S.C. § 1123(b)) .......................15


        B.      The Plan Meets The Requirements of Section 1129 for Confirmation ...........15

                1.      The Debtors' Plan Complies with 11 U.S.C. § 1129(a)(2)....................16

                2.      The Plan Was Proposed in Good Faith (11 U.S.C.
                        § 1129(a)(3)) ..........................................................................16

                3.      All Payments for Services, Costs and Expenses to
                        Professionals Have Been or Are Subject to Approval of
                        the Court as Required by 11 U.S.C. § 1129(a)(4) ................16

                4.      Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5))....................17

                5.      The Plan Proposes No Rate Changes Under 11 U.S.C.
                        § 1129(a)(6) ............................................................................17

                6.      The Plan Meets The "Best Interests" Test Under 11
                        U.S.C. § 1129(a)(7) .................................................................17

7.  The Plan Has Been Accepted by Impaired Classes (11 U.S.C. § 1129(a)(8)) .................................................. 17

8.  The Treatment of Administrative and Tax Priority Claims and Other Priority Claims Under the Plan Satisfies 11 U.S.C. § 1129(a)(9) ................................ 17

9.  The Plan Has Been Accepted by At Least One Impaired Class (11 U.S.C. § 1129(a)(10)) ................................ 18

10. The Plan is Feasible (11 U.S.C. § 1129(a)(11)) ..................... 18

11. The Plan Provides for the Payment of Required Fees (11 U.S.C. § 1129(a)(12)) ........................................ 18

12. Section 1129(a)(13) Regarding Continuation of Retiree Benefits Is Not Applicable ........................................ 18

13. The Settlement Incorporated in the Plan Should Be Approved (11 U.S.C. § 1123; Bankruptcy Rule 9019) ......... 19

14. The Principal Purpose of Plan Is Not The Avoidance of Taxes (11 U.S.C. § 1129(d)) .................................... 19

VII. The Objections of the Lone Dissenters, Huntington Bank and Fifth Third Bank, to the Disclosure Statement and the Plan Should Be Overruled .............................................................................. 19

A.  The Disclosure Statement Satisfies Section 1125 Because The Lone Dissenters Had Both "Adequate Information" and Ample Opportunity to Obtain Any Additional Information Requested ................... 19

B.  The Plan Properly Classifies the Secured Lenders' Claims and Treats All Holders of Claims In Class 1 The Same By Giving Each Secured Lender The Same Choices.  It Satisfies 11 U.S.C. § 1123(A) (4) ......................................................... 23

C.  The Release Of The Debtors' And Their Debtor Affiliates' Claims Against The Secured Lenders Embedded In The Plan Is An Integral Component Of The Plan ............................ 27

D.  The Injunctions Included In The Plan Are Reasonable And Necessary To The Implementation Of The Plan Including The Provisions That Enjoin The Pursuit Of Any Claims By Secured Lender Against Non-Debtor Borrowers ................................ 30

1.  The Injunction Against Pursuit of Claims Against Non-Debtor Borrowers Is Fair, Reasonable and Necessary to the Plan ......................................................... 31

2.  The Injunction Against Pursuit of Claims Against the Secured Lenders Is Fair, Reasonable and Necessary to the Plan ......................................................... 34

3

3.	Even If Regarded as Releases, The Injunction Against Pursuit of Claims Against The Non-Debtor Borrowers and the Secured Lenders for Claims Inconsistent With the Plan Are Approvable Under Applicable Case Law.......................36

E.	The Plan is Feasible ...............................................39

F.	Debtors are Able to Demonstrate that the Lone Dissenters Fair Better Under the Plan Than Under a Hypothetical Chapter 7 Liquidation and the Plan Meets 11 U.S.C. § 1129(a)(7) ...................41

G.	The Plan Meets 11 U.S.C. § 1129(a)(4) And The Offset Amount Is Not An "Unreasonable Fee" As Fifth Third Contends. ...............42

H.	The Plan Does Not Violate 11 U.S.C. § 1129(b)(2) Or The "Absolute Priority" Rule Invoked By Fifth Third Because The Rule Codified In The Statute Applies Only To *Unsecured* Claims Not Secured Claims Such As Those Held By Fifth Third........................................................43

I.	The Plan is Proposed in Good Faith...................................44

J.	Fifth Third's Argument That it is Being Denied an Ability to Make an Election Under 11 U.S.C. § 1111(b) Should be Overruled Because the Election Under Section 1111(b) Belongs Only to the Class Not an Individual Claimholder ...........................45

VIII.	CONCLUSION ...............................................................46

I.    **INTRODUCTION**

Many have sacrificed a lot to bring these cases to a conclusion that, while it may be prompt by bankruptcy standards, is tortuously slow and expensive when measured next to the demands of the marketplace. Most Secured Lenders have agreed to contribute new financing on terms more favorable than applied previously. Management has worked hard for a fraction of what it was paid in better times. Tax authorities have cooperated with a keen eye to the consequences of failure.

Like Inspector Javier in Les Miserables, however, just two of thousands of participants have been not just inflexible, but irrationally obstructive. Undeterred by being badly outvoted in their Class or by the provisions of the Bankruptcy Code themselves, these two creditors continue to fight against a Plan that, even with the reduction in payments it proposes for them, will nonetheless pay them 98% of all that they loaned to the Debtors -- plus continuing interest.

Respectfully, the position of these two creditors has no support in law or fact and this Memorandum explains in detail why this is so. Both the difficulty in aligning all those whose participation is necessary and the challenges of competition in an already battered industry fully support an immediate conclusion to these cases.

Debtors submit this Memorandum of Law in support of the confirmation of Debtors' Plan of Reorganization dated August 12, 2011 ("Plan"). The Confirmation Hearing is scheduled before the Court for October 28, 2011 ("Confirmation Hearing"), and the purpose of this Memorandum of Law is to summarize how the Plan meets all of the requirements of the Bankruptcy Code for confirmation, to address relevant case law applicable to certain specific

provisions of the Plan and to refute the objections that have been filed by just two of Debtors' thousands of creditors.

As detailed below, all five classes of claims and interests under the Plan are either unimpaired or have voted in favor of the Plan in the required number and amount under Section 1126(c) of the Bankruptcy Code. Debtors have also resolved all issues with holders of priority tax claims, including the claims of the Internal Revenue Service ("IRS") and the Pennsylvania Department of Revenue ("Pa. DOR") and expect that a Stipulation with each will be presented to the Court at the time of the Confirmation Hearing. Debtors have also resolved by stipulation the claims of GE Commercial Finance Business Property Corporation ("GE Commercial"), a secured lender with respect to property located in Ohio, and that Stipulation will also be presented to the Court at the Confirmation Hearing.

The Plan proposes to pay all General Unsecured Creditors in full and most have already been paid pursuant to prior Orders of this Court. As to Debtors' Secured Lenders under its Pre-Petition Revolving Credit Agreement, that class of Secured Lenders (Class 1) has voted to accept the Plan, with 12 of the 14 holders (86% in number) and 88.5% in amount voting to accept the Plan. The lone objectors to the Plan are Huntington Bank ("Huntington") and Fifth Third Bank ("Fifth Third") (collectively, the "Lone Dissenters"), two members of the Secured Lenders class (Class 1) holding just 11.5% of the total claims in that class. They did not vote in favor of the Plan and now seek to prevent confirmation of the Plan notwithstanding the overwhelming acceptance of it by their class of creditors.

The Plan meets all the requirements for confirmation under the Bankruptcy Code. Section 1129(a)(7) of the Code requires that each holder of a claim in a class either vote to

accept the plan or receive treatment under the plan that is not less than the amount such holder would receive in a Chapter 7 liquidation. Debtors will demonstrate with evidence and testimony at the Confirmation Hearing what is already known to all creditors other than the Lone Dissenters: that liquidation is a disastrous outcome for all and the treatment of the Secured Lenders under the Plan is considerably better, not less, than what the Secured Lenders would receive in a Chapter 7 liquidation. For the reasons discussed below and to be further addressed with evidence at the Confirmation Hearing, the other objections of the Lone Dissenters are also unavailing and do not prevent this Court from confirming the Plan following the Confirmation Hearing.

## II.    **BACKGROUND**

The background of these cases was set out at length in the Debtors' Motion for Emergency Use of Cash Collateral filed by them on the first day the cases were commenced on April 18, 2011 (Docket No. 6)[1], and again in the Debtors' Joint Disclosure Statement filed in August (Docket No. 117). The detailed recitations contained in those documents are not repeated here, but will be reviewed with the Court as pertinent in the scheduled Confirmation Hearing. Debtors do summarize their story here as follows. After Debtors and their affiliated companies made significant strides to overcome and weather a colossal downturn in the residential construction business precipitated largely by the actions of mortgage lending institutions, and paid down their debt to their lenders from over $430 million to less than $130 million, Debtors and their affiliates were damaged by breaches of contract and other wrongful conduct that caused them unnecessary expenses and substantial losses in connection with a revised Credit Agreement with their lenders. When despite these events, the Debtors and their

---

[1] Unless otherwise indicated, all references to a "Docket No." are to Docket numbers in the case at Maronda Homes, Inc. 11-22418-JFK.

affiliates thought they had worked out a satisfactory fix to the problems, and reached agreement with their lenders, they were told that only one or two banks refused to agree, and the banks continued seizing all of the proceeds from sales of homes. Left with no option other than extinction, the Debtors were forced to commence these bankruptcy cases and suffered severe business consequences and mounting damages as a result. The plain truth is that the Debtors had a solution that would have avoided the need for a bankruptcy and the resulting pain, and a majority of their lenders were in concurrence. Two Lenders, Huntington and Fifth Third, however, have chosen to oppose the resolutions and have thereby prolonged and exacerbated the damages and losses. Thus, the precipitation and continuation of the bankruptcy proceedings is attributable to Huntington and Fifth Third, and their conduct has resulted in damages aggregating nearly $79 million. Now Debtors have a Plan of Reorganization before the Court that will allow Debtors to emerge from bankruptcy, to settle the disputes they have with their lenders and to return to normalized operations, but confirmation of the Plan is opposed by same two lenders that are responsible for the losses and damages that have been incurred.

III.   **DESCRIPTION OF THE PLAN**

The Plan provides for five classes of creditors: 1) Class 1 – the Secured Lenders under the Pre-Petition Credit Agreement; 2) Class 2 – Other Secured Lenders (which consists of one other lender, GE Commercial, whose debt is secured by a single property in Ohio); 3) Class 3 – Priority Non-Tax Claims; 4) Class 4 - General Unsecured Claims; and 5) Class 5 – Interests (Equity). The Plan proposes payment in full of the allowed claims of all Priority (Class 3) and General Unsecured (Class 4) creditors. Because those claims are unimpaired, the holders of those claims were not required to vote on the plan. Class 2 is not impaired and has accepted its treatment under the Plan pursuant to a Stipulation. Class 5 (Equity) is impaired because,

although the equity holders retain their interests in the Debtors, they do not recover or receive the full amount of damages incurred as a result of claims relating to the Secured Lenders. Class 5 has voted to accept the Plan.

The Plan also provides for the payment in full or at a small discount (depending on the option selected) of the allowed claims of the Secured Lenders under Class 1.[2] The Secured Lender Class is impaired because, *inter alia*, the maturity date of March 12, 2012 contained in the March 8, 2010 Pre-Petition Credit Agreement is extended to September 30, 2014. As to the Secured Lenders Class 1, the Plan proposes to pay all interest and pre-petition fees and expenses through the Petition Date (most has been already paid) due to the Lenders under the Pre-Petition Credit Agreement.

The Plan also proposes the resolution and settlement of claims held by the Debtors and their non-Debtor Borrowers[3] against the Secured Lenders under the Credit Agreement, and the Plan includes associated releases given by the Debtors and non-Debtor Borrowers in consideration of confirmation of the Plan. The claims arise out of the breaches of contract and other lender misconduct that resulted in excessive fees and charges and the further, separate wrongful conduct of Huntington and Fifth Third that led to the costs and consequences of the bankruptcies and the continuing damage and losses therefrom. Debtors and the non-Debtor

---

[2]  The "Secured Lenders" are: Bank of America, N.A., Wells Fargo Bank, N.A., Wachovia Bank, National Association, PNC Bank, National Association, KeyBank National Association, Huntington National Bank, Fifth Third Bank, Regions Bank, Midtown Acquisition GP LLC (as transferee of BMO Capital Markets Financing, Inc.), SunTrust Bank, N.A., Compass Bank (as successor to Guaranty Bank), Compass Bank, Midtown Acquisition GP LLC and Grace Bay Holdings II, LLC (as transferee of Comerica Bank), and Grace Bay Holdings II, LLC (as transferee of U.S. Bank National Association).
[3]  The "non-Debtor Borrowers" are affiliates of the Debtors that did not file for bankruptcy but are co-Borrowers with Debtors on the Pre-Petition Credit Agreement with the Secured Lenders. The non-Debtor co-Borrowers are: Maronda, Inc., Maronda Homes. Inc. of Florida, Maronda Homes, Inc. of Georgia, Leafy Dell, LLC, Curtis Farms, LLC, Twin Lakes Holdings, LLC, Sussex Place, LLC, Autumn Grove, LLC and Showcase Properties, Inc.

Borrowers estimate that the losses from excessive fees, costs, interest charges, lost profits and reputational damage are in excess of $79 million. The settlement contained in the Plan settles the Debtors' and their affiliates' claims for the sum of $12 million. The payments to be made under the Plan to the Secured Lenders for their claims are subject, therefore, to an offset to the amounts due under the Pre-Petition Credit Agreement for the $12 million amount of the settlement (defined in the Plan as the "Offset Amount").

The Plan also provides for "exit financing" to provide the Debtors and their affiliates with the availability of funding required to operate their businesses going forward. The terms of the Exit Financing are summarized in Section 13.07 of the Plan. Thus, the Plan includes a post-confirmation credit facility allowing Debtors and their non-Debtor Borrowers to borrow up to $128 million (reduced by $3 million quarterly beginning 2012) based upon a borrowing base availability tied to the appraised value of their real property ("Exit Financing"). The maturity date of the Exit Financing is September 30, 2014, ensuring that Debtors and their affiliates will have access to funding and credit for nearly 3 years. The terms of the Exit Financing also adjust certain advance rates favorably to Borrowers and restructure certain fees and costs from those the Borrowers faced before.

Under the Plan, no Secured Lender was forced to become an Exit Lender if it did not want to assume that risk and the commitment to further lend. Rather, each pre-petition Secured Lender in Class 1 was given the same option under the Plan to either elect to participate in the Exit Financing or not. All Secured Lenders under Class 1 had the option to elect to not participate in the Exit Financing and, in such case, to retain their pro rata interest in pre-petition collateral pledged as of the Petition Date, to continue to receive their pro rata share of interest and to continue to receive net proceeds from sales of real estate in which the Secured Lenders

had a perfected lien as of the Petition Date based on the value of the collateral as of the Effective Date of the Plan (Plan, ¶5.01(c)(A)).

Lenders that elected to participate in the Exit Financing and committed to make further advances under the terms of the Exit Financing receive under the Plan a reaffirmation of perfected liens as of the Petition Date, a pledge of about $5 million of Debtors' property in Ohio and Pennsylvania in which Lenders did not have a perfected lien as of the Petition Date and a pledge of approximately $20-30 million of additional property in Florida (Plan, ¶5.01(c)(B)). The pro rata share of the commitment by each Secured Lender participating in the Exit Financing is adjusted upward to encompass the pro rata share of the Lenders that elect to not participate in Exit Financing (*i.e.*, the other Secured Lenders will pick up the percentages of Huntington and Fifth Third for all advances made under the Exit Financing since Huntington and Fifth Third elected not to participate in the Exit Financing).

The allowed claims of all Secured Lenders in Class 1, including those electing to participate in the Exit Financing, are subject to the offset for the Offset Amount. Thus, each Lender's claim is reduced by its pro rata share of the Offset Amount. As consideration for assuming an increased pro rata share of the commitment under the Exit Financing, for participating in the Exit Financing and committing to a three-year facility and for otherwise incurring the risks and obligations related to restructuring the Pre-Petition Credit Agreement, however, the pro rata share of the Offset Amount for every Secured Lender that elected to participate in the Exit Financing is reduced to zero. Under the Plan, all Secured Lenders, whether they elect or not to be Exit Financing lenders, receive the benefit of the release of claims provided by the Debtors and by their non-Debtor affiliates.

## IV. BALLOT RESULTS

As required, Debtors have filed a Report of Ballots summarizing the results of balloting (Doc. No. 161). The summary of the Report regarding those classes under the Plan that voted is as follows:

Class 1 – Secured Lenders

| | |
|---|---|
| Acceptance | 12 in number (out of 14) (85.7%)<br>88.5% in amount |
| Rejection | 2 in number (out of 14) (14.3%)<br>11.5% in amount |

Class 1 has voted to accept the Plan.

Class 5 – Interests

| | |
|---|---|
| Acceptance | 3 in number (out of 3) (100%)<br>100% in amount |
| Rejection | None |

Class 5 has voted to accept the Plan.

All other Classes are unimpaired and are deemed to accept the Plan without any requirement to vote.

## V. STATUS OF PROOFS OF CLAIM

Bar dates for filing Proofs of Claim were established in these cases as August 16, 2011 for general creditors and October 17, 2011 for governmental claims. The total number of Proofs of Claim filed in each bankruptcy case is as follows:

| | |
|---|---|
| Maronda Homes, Inc. (No. 11-22418-JKF) | 22 Proofs of Claim |
| Maronda Homes Inc of Ohio (No. 11-22422-JKF) | 13 Proofs of Claim |
| Maronda Homes of Cincinnati, LLC (No. 11-22424-JKF) | 9 Proofs of Claim |

In some cases, the same Proof of Claim was filed in each case and therefore overlap. For example, the Internal Revenue Service and Bank of America, as Administrative Agent for the Secured Lenders, filed the same Proof of Claim in each of the three cases for claims of the Secured Lenders, the payment of which is addressed by the terms of the Plan. GE Commercial (Class 2 holder) filed a Proof of Claim that is resolved by it Stipulation. Three Proofs of Claim filed by CIT Technology in the Maronda Homes, Inc. case were withdrawn because they related to a non-debtor entity.

The rest of the Proofs of Claims are either 1) filed by holders of General Unsecured Claims whose claims have paid (or will be paid in accordance with the final determination of any objections to the claims[4]); 2) are unliquidated claims filed by plaintiffs in pending litigation matters that will be adjudicated in the ordinary course following confirmation of the Plan; or 3) in one case, a claim filed by a tenant under a lease that is current in payment and which will be affirmed under the terms of the Plan.

## VI.   THE PLAN MEETS ALL THE REQUIREMENTS OF SECTION 1123 AND 1129 OF THE BANKRUPTCY CODE AND SHOULD BE CONFIRMED

**A.     The Plan Meets the Contents Requirements of Section 1123**. Section 1123 of the Bankruptcy Code sets forth certain requirements for the contents of a confirmable plan. The Debtors' Plan meets those requirements.

1.     The Plan Makes Proper Classification of Claims as Required by 11 U.S.C. §§ 1122, 1123(a)(1). Section 1123(a)(1) of the Code specifies that a plan shall designate classes of claims and interests, and Section 1122 requires that a claim placed in a class be substantially

---

[4]   Debtors reserve their right to file objection to any Claim in accordance with the terms of the Plan but currently anticipate that objections will be few, if any.

similar to the other claims of such class. Pursuant to Bankruptcy Code Sections 1122(a) and 1123(a)(1), Article V of the Plan designates five Classes of claims and interests. As required by Bankruptcy Code Section 1122(a), each Class of claims and interests contains only claims or interests that are essentially identical to the other claims or interests within that Class. Valid business, factual and legal reasons exist for separately classifying the various Classes of claims and interests created under the Plan and the Plan's treatment thereof does not unfairly discriminate between holders of Claims or Interests. Pursuant to Bankruptcy Code Section 1123(a)(1), Administrative Claims and Priority Tax Claims are not required to be designated. The objections of the Lone Dissenters to the classification of their claims is further addressed below at pages 23 - 25.

2. <u>Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>. In compliance with Bankruptcy Code Section 1123(a)(2), Sections 5.02, 5.03 and 5.04 of the Plan specify that Classes 2, 3 and 4 are not impaired because the legal, equitable or contractual rights of holders of Claims in this Class are not altered under the Plan.

3. <u>Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>. In compliance with Bankruptcy Code Section 1123(a)(3), Sections 5.01 and 5.05 of the Plan specify the treatment of each impaired Class of claims and each impaired Class of interests. Classes 1 and Class 5 are designated as impaired because the legal, equitable or contractual rights of holders of claims or interests in these Classes are altered under the Plan.

4. <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>. In compliance with Bankruptcy Code Section 1123(a)(4), Sections 5.01 through 5.05 of the Plan provide for the same treatment of each claim or interest in a particular Class, except to the extent that holders of claims or interests have agreed to less favorable treatment of their Claims or Interests. The specific

objections of the Lone Dissenters to the Plan's treatment of Class 1 claims are addressed below at pages 25 - 27.

5. _Implementation (11 U.S.C. § 1123(a)(5))_. In compliance with Bankruptcy Code Section 1123(a)(5), Article VII of the Plan, entitled "Means for Implementation", sets forth the means for implementation of the Plan, which means are adequate and proper. Article VII of the Plan provides, among other things, for the consummation of the Exit Financing for the Debtors and their co-Borrower affiliates. Article VII and the other provisions of the Plan provide a clear means for implementation of the Plan, thereby satisfying the requirements of Section 1123(a)(5).

6. _Selection of Officers and Directors (11 U.S.C. § 1123(a)(7))_. The provisions of the Plan do not alter the existing manner of selection for officers and directors of the Debtors and, therefore, the Plan meets the requirements of Section 1123(a)(7) that such procedures are "consistent with the interests of creditors and equity security holders and with public policy . . . ."

7. _Additional Provisions (11 U.S.C. § 1123(b))_. Bankruptcy Code Section 1123(b) describes certain other permissible plan provisions, of which several are included in the Plan, including, without limitation, provisions that provide for the assumption of executory contracts and leases, 11 U.S.C. § 1123(b)(2), the settlement of claims belonging to the Debtors 11 U.S.C. § 1123(b)(3)(A), and the retention and enforcement by the Debtors of certain claims and causes of action, 11 U.S.C. § 1123(b)(3)(B).

B. **The Plan Meets The Requirements of Section 1129 for Confirmation.** Section 1129 of the Bankruptcy Code sets forth requirements for confirmation of a Plan, and Debtors' Plan meets each of these requirements.

1.      The Debtors' Plan Complies with 11 U.S.C. § 1129(a)(2).   Section 1129(a)(2) requires that the proponents of the plan (here, the Debtors) comply with the applicable provisions of the Code.   The Debtors have complied with all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code Sections 1125 (regarding postpetition disclosure and solicitation) and 1126 (regarding acceptance of the Plan) and Bankruptcy Rules 3017 and 3018 regarding the Disclosure Statement and the Plan solicitation.   The Disclosure Statement contains adequate information and the procedures by which the ballots for acceptance or rejection of the Plan were solicited and tabulated were fair, properly conducted and in accordance with Bankruptcy Rules 3017 and 3018 and Bankruptcy Code Section 1126. Accordingly, the requirements of Bankruptcy Code Section 1125 and Section 1129(a)(2) have been satisfied.   The objections of the Lone Dissenters to the adequacy of the Disclosure Statement are addressed below at pages 19 - 23.

2.      The Plan Was Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).   The Debtors proposed the Plan in good faith and not by any means forbidden by law.   The Plan is the result of extensive arms' length negotiations among the Debtors, their affiliates and their creditors and resolves significant claims and other disputes.   The Debtors have proposed the Plan in order to achieve the greatest distribution for all creditors, and to avoid delay and unnecessary costs in making distributions.   Accordingly, the Plan satisfies the requirements of Bankruptcy Code Section 1129(a)(3).

3.      All Payments for Services, Costs and Expenses to Professionals Have Been or Are Subject to Approval of the Court as Required by 11 U.S.C. § 1129(a)(4).   Pursuant to Section 4.03 of the Plan, each professional who holds or asserts a Fee Claim is required to file with the Bankruptcy Court, and serve a final application upon all parties required to receive notice within sixty (60) days after the Effective Date, and any fees and expenses reimbursement

requested in such application are payable only to the extent allowed by the Court. This provision complies with Bankruptcy Code Section 1129(a)(4).

4.  Directors, Officers and Insiders (11 U.S.C. § 1129(a)(5)). The officers and directors of the Debtors identified in these cases will continue to serve in the same capacities after the Effective Date. Accordingly, the Debtors have identified the individuals who serve as directors and officers and the Plan satisfies Bankruptcy Code Section 1129(a)(5).

5.  The Plan Proposes No Rate Changes Under 11 U.S.C. § 1129(a)(6). The Plan does not provide for or contemplate any rate change that would require the approval of any regulatory agency. Accordingly, Bankruptcy Code Section 1129(a)(6) is inapplicable.

6.  The Plan Meets the "Best Interests" Test Under 11 U.S.C. § 1129(a)(7). The Plan satisfies Bankruptcy Code Section 1129(a)(7). At the Confirmation hearing, the Debtors will present evidence, financial information, reports and witnesses in support of a liquidation analysis demonstrating that based on the treatment of the Secured Lenders under Class 1 of the Plan, they will receive under the Plan far more than they would receive in a liquidation if the cases were converted to Chapter 7 proceedings. The Lone Dissenters' objections to Debtors' ability to meet this test are further addressed below at pages 41 - 42.

7.  The Plan Has Been Accepted by Impaired Classes (11 U.S.C. § 1129(a)(8)). Both voting Impaired Classes have voted to accept the Plan. Under the Plan, there were only two impaired classes - - - Class 1 (Secured Creditors) and class 5 (Equity) - - - and both voted to accept the Plan in accordance with the requirements of the Bankruptcy Code.

8.  The Treatment of Administrative and Tax Priority Claims and Other Priority Claims Under the Plan Satisfies 11 U.S.C. § 1129(a)(9). The treatment of Administrative Claims

and Other Priority Claims under the Plan satisfies the requirements of Bankruptcy Code Section 1129(a)(9)(A) and (B), and the treatment of Priority Tax Claims under the Plan as set forth in the Stipulations to be submitted to the Court at the Confirmation Hearing, satisfies the requirements of Bankruptcy Code Section 1129(a)(9)(C).

9. <u>The Plan Has Been Accepted by At Least One Impaired Class (11 U.S.C. § 1129(a)(10))</u>. At least one Impaired Class has voted to accept the Plan. Class 1 (Secured Lenders) is an impaired class that has voted to accept the Plan.

10. <u>The Plan is Feasible (11 U.S.C. § 1129(a)(11))</u>. The Plan provides for Exit Financing that will provide Debtors (and their affiliates) with sufficient funds and credit availability to continue their operations in the normal course. Debtors will therefore have demonstrated that the Plan is not likely to be followed by liquidation or the need for further reorganization and the Plan and satisfy Bankruptcy Code Section 1129(a)(11). The objection of Fifth Third to the feasibility of the Plan is addressed below at pages 39 - 41.

11. <u>The Plan Provides for the Payment of Required Fees (11 U.S.C. § 1129(a)(12))</u>. Pursuant to Section 4.01(b) of the Plan, the fees payable under 28 U.S.C. § 1930 will be paid on the Effective Date and thereafter as such fees may accrue and be due and payable, thereby satisfying Bankruptcy Code Section 1129(a)(12).

12. <u>Section 1129(a)(13) Regarding Continuation of Retiree Benefits Is Not Applicable.</u> Because the Debtors were not obligated to pay any "retiree benefits" (as that term is defined in Bankruptcy Code Section 1114), as of the Petition Date, Bankruptcy Code Section 1129(a)(13) is inapplicable .

13.     The Settlements Incorporated in the Plan Should Be Approved (11 U.S.C. § 1123; Bankruptcy Rule 9019)).  The Plan incorporates a release and settlement that resolves claims of the Debtors and their affiliates against the Secured Lenders.  At the Confirmation Hearing, the Debtors will provide sufficient evidence to establish that the settlement incorporated into the Plan meets the applicable standards for approval by this Court.  See also, pages 27 - 30 below.

14.     The Principal Purpose of Plan Is Not The Avoidance of Taxes (11 U.S.C. § 1129(d)).  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e) and therefore the requirements of 11 U.S.C. § 1129(d) are satisfied.

## VII.  THE OBJECTIONS OF THE LONE DISSENTERS, HUNTINGTON BANK AND FIFTH THIRD BANK, TO THE DISCLOSURE STATEMENT AND THE PLAN SHOULD BE OVERRULED

### A.     The Disclosure Statement Satisfies Section 1125 Because The Lone Dissenters Had Both "Adequate Information" and Ample Opportunity to Obtain Any Additional Information Requested.

Both Huntington and Fifth Third complain that the Debtors' Disclosure Statement does not provide them with sufficient information.  The argument is wholly disingenuous based on what the Bankruptcy Code requires, the extensive and detailed level of information that was actually provided to all Secured Lenders including Huntington and Fifth Third, and the fact that both of the Lone Dissenters were repeatedly offered the opportunity to obtain any additional information they requested but both failed to avail themselves of those opportunities.  Their attempts to now delay or derail the Plan confirmation process on the basis that they need additional information are specious and should be rejected.

The Bankruptcy Code is clear that what constitutes "adequate information" for purposes of a Disclosure Statement is subject to the discretion of the Bankruptcy Court and is dependent upon the particular circumstances of each case as well as the creditor in question.  In Re Monroe Well Service, Inc., 90 B.R. 324, 331 (Bkrtcy. E.D. Pa. 1987) ("It is clear Congress intended for bankruptcy judges to exercise a great deal of discretion when considering the 'adequacy of information' provided by a disclosure statement.")  The definition of "adequate information" in Section 1125 specifically states that in determining the sufficiency of a Disclosure Statement the Court is to "consider the complexity of the case, the benefit of additional information to creditors" and the cost of providing additional information.  11 U.S.C. § 1125(a)(1).

Section 1125 of the Code defines "adequate information" to mean information of a kind and in sufficient detail to enable a "hypothetical investor typical of the holders of claims" to make an informed judgment in the case.  The term "hypothetical investor typical of holders of claims" is defined in Section 1125(a)(2) as an investor having a claim in the relevant class, "a relationship with the debtors as the holders of other claims of such class generally have" and "such ability to obtain such information from sources other than the disclosure required by this section as holders of the claims in such class generally have."

These provisions are particularly relevant to the objections of the Lone Dissenters in the circumstances of this case.  Both Huntington and Fifth Third are members of the class of Secured Creditors to whom these Debtors and their non-Debtor Borrowers have provided regular and extensive financial information both before and during the bankruptcy case.  Debtors have without exception provided all information that has ever been requested by the Secured Lenders either directly or through the Lenders' Administrative Agent.  This includes, among other information, detailed information regarding the Debtors' assets and the sales and dispositions of

property and assets, the valuation of the assets including in connection with appraisals of every item of real property owned by Debtors and non-Debtor Borrowers that were performed in the last few months by professionals retained by the Secured Lenders themselves and information regarding the Debtors' assessment of its and their affiliates' current and projected financial condition. (See Debtors' Response to Huntington's Objections, ¶ 30-31 and Debtors' Response to Fifth Third's Disclosure Statement Objections, ¶ 15, for a detailed list of the information provided). Indeed, for the last year, in the time from the negotiation of a revised Credit Agreement through today, the Secured Lenders have been privy to and examined tens of thousands of pages of financial and operating information regarding every aspect of the Debtors' and non-Debtors' business, operations, assets, liabilities and financial condition.

Huntington and Fifth Third have had access to all of this information. All of the information furnished by the Debtors and the non-Debtor Borrowers is made available to all Lender participants including Huntington and Fifth Third through an IntraLinks system in which the information is posted online and is available for repeated access and review by each Lender.

Significantly, numerous Bankruptcy Courts have held that creditors have standing to object to a disclosure statement only as to their class and may not object to the adequacy of a disclosure statement as it might affect another class of creditors. See In Re Adana Mortgage Bankers, Inc., 14 B.R. 29, 30 (Bankr. N.D. Ga. 1981). Here that is significant because no creditor of these Debtors other than Huntington and Fifth Third has raised any objection to the adequacy of the information provided. Twelve of the 14 members of the Secured Class holding the same claims as Huntington and Fifth Third raised no objection to the adequacy of the information they had. The irony of this is that Huntington and Fifth Third have had more information about these Debtors and their non-Debtor Borrowers than all but 12 other creditors,

and equal to those 12, and all 12 of them voted in favor of the Plan without raising any objection to the adequacy of the information provided.

Debtors' efforts with respect to the Lone Dissenters in particular, however, went even further. For some time, but certainly by the time the Debtors filed their Joint Plan of Reorganization in August 2011, it was known that Huntington and Fifth Third might object to the Plan. Any doubt about that was confirmed at the hearing before this Court on August 26th when both Huntington and Fifth Third appeared and expressed openly in Court their intention to at least raise questions about if not oppose the Plan. Debtors through their counsel specifically reached out to both Huntington and Fifth Third and offered on repeated occasions to provide them with any information they requested, to review any of the vast information about Debtors and their affiliates that had been provided and to answer any questions that either institution might have about the Debtors, the non-Debtors, the Plan or any matter related thereto. Huntington made no request whatsoever for information and ignored the Debtors' repeated offers to meet. Fifth Third did respond initially to Debtors' offers, and Debtors and Fifth Third had two meetings: one on August 19 with their counsel and one on September 19 with representatives of Fifth Third and principals of the Debtors, plus counsel. Both of these meetings lasted several hours and, at them, the Debtors reviewed in detail both the nature of the claims that the Debtors and their co-Borrowers held against the Secured Lenders as well as the reasons, financial basis and explanation for why the treatment of the Secured Lenders under the Plan was better than they would receive under a hypothetical Chapter 7 liquidation. Debtors offered to meet further and to provide any additional information requested but received no requests from Fifth Third, which maintained its opposition to the Plan.

It is clear from these circumstances that Huntington and Fifth Third's objections to the adequacy of the Disclosure Statement are not genuine and are in no way directed toward obtaining information that they claim they needed in order to be in a position to vote on the Plan. The lack of genuineness and good faith is fully exposed by the latest antics of Fifth Third. After months of not pursuing Debtors' offers to provide information and provide further explanations, just a few days ago (after the voting and objection deadline), Fifth Third served "discovery" on Debtors including a request for a deposition the day before the Confirmation Hearing. The entire effort is a distraction, intended solely to obfuscate, not enlighten. Its greatest irony and revelation of true intention is that virtually all of the information requested by Fifth Third's "discovery" was already in its possession! Notwithstanding this "Kabuki Theater," Debtors are in fact responding to Fifth Third's discovery, and will provide answers, information and a witness for a deposition on the schedule that Fifth Third belatedly demanded. All of this more than adequately demonstrates that Debtors have acted in good faith and have in fact provided more than "adequate information" to these two creditors, especially considering as the Bankruptcy Code contemplates that the disclosure must be gauged with recognition of the relationship that the creditor has with the Debtors as well as the ability to obtain information from sources other than the Disclosure Statement.

**B.** **The Plan Properly Classifies the Secured Lenders' Claims and Treats All Holders Of Claims In Class 1 the Same By Giving Each Secured Lender the Same Choices. It Satisfies 11 U.S.C. § 1123(a)(4).**

The Lone Dissenters object to the classification of their claims and the inclusion of their claims with other Secured Lenders in Class 1. Class 1 includes the claims of the Secured Lenders, and all Secured Lenders under the Pre-Petition Credit Agreement were placed in the same class. All such creditors, including dissenters Huntington and Fifth Third, were syndicated lenders to the Debtors and non-Debtor Borrowers under the same Agreement. All are parties to the same Pre-Petition Credit Agreement. They all share identical security interests in the same

collateral of the Debtors and all share participations in loans that were made, administrated, repaid and reborrowed under the same credit documents administered by the same Administrative Agent. Not only is their classification sensible and rational, there existed no basis for classifying any of the claims of the Secured Lenders differently than as a single class under the Plan.

The Lone Dissenters turn the issue of classification on its head by arguing that since they ultimately voted differently than the other members of their Class, and made a different choice, they should have been placed in a different class under the Plan. Such "pre-voting" classification was not only logically impossible but is neither required nor permitted by the Bankruptcy Code. Section 1122 provides that a plan may place a claim in a particular class if it is substantially similar to the other claims in the class. 11 U.S.C. § 1122(a). Indeed, a plan proponent is afforded significant flexibility in classifying claims provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar. Aetna Casualty & Surety Company v. Clerk (In re Chateaugay Corp.), 89 F.3d 942, 949 (2d Cir. 1996); In Re Idearc Inc., 423 B.R. 138 (Bkrcy. M.D. Tex. 2009). Here, however, there is not only a reasonable basis for including all of the Secured Lenders in a single class but it is the only basis upon which these claims could have been classified.

The Lone Dissenters' argument seems to suggest that the 12 other members of the Class had decided and committed to vote as they did or had committed to provide Exit Financing prior to the submission of their votes under the Plan. Any such suggestion is irrelevant but also wrong. No Secured Lender in Class 1 committed to provide Exit Financing or made the election to do so until the time that its ballot with respect to the Plan was submitted on October 14, 2011. Up to that moment every Secured Lender, like Huntington and Fifth Third, had the option to

choose to not become an Exit Financing Lender and each considered its options to the end. The classification of the Secured Lenders in a single class under the Plan is sound and in accordance with the Bankruptcy Code.

The Lone Dissenters also contend that the Plan is discriminatory and violates Section 1123(a)(4) because it fails to provide the same treatment for each claim in Class 1. The basis for their assertion is that while all holders of claims in Class 1 have Allowed Claims and all holders are subject to an offset for their pro rata amount of the $12 million Offset Amount, the offset is waived for all holders who elect under the Plan to provide the Exit Financing which they did not elect to do; thereby allegedly creating discriminatory treatment. The argument fails for several reasons.

First, there is no discrimination or difference in treatment as to the holders of Class 1 claims. All holders of claims in Class 1 are treated in exactly the same manner. Each Class 1 holder, Huntington and Fifth Third included, was given the same option under the Plan to either elect to provide a commitment for the Exit Financing or not. Each Secured Lender had the exact same choice. The difference, to the extent it occurred, is a difference in outcome, resulting from the choice made by the holder itself, not a difference in treatment under the Plan. The proper focus here is on the treatment provided in the Plan, not the results or effect of a choice made by the holder of a claim. As courts have recognized, "the key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity." In re Dana Corp., 412 B.R. 53, 62 (S.D.N.Y. 2008)

An argument similar to one made here by the Lone Dissenters was rejected by the Bankruptcy Court in In Re Cajun Electric Power Cooperative, Inc., 230 B.R. 715 (Bkrtcy. M.D. La. 1999). In that case, an electric cooperative corporation had proposed in its bankruptcy plan

that participating cooperatives grouped into a single class could choose to execute new supply contracts with the debtor with attendant risks or allow existing power supply agreements to remain in place. The United States Trustee and one of the cooperatives in the class objected arguing that the Plan violated Section 1123(a)(4) of the Bankruptcy Code because it resulted in different treatment between consenting and non-consenting cooperatives. The Court rejected the argument and stated as follows:

> Although the Court agrees that the cooperatives will be treated differently, that treatment is based upon their choice rather than by virtue of the Plan being confirmed. Each cooperative has been offered the same option of entering into new power supply contracts. The same contract was offered to all parties. [The objector] chose not to enter into the contract. Thus, the difference in treatment between [cooperatives] results solely as a result of their choice.

The circumstance is precisely the same here. Any difference in outcome for Huntington and Fifth Third is a result of their choice, and the choice they were given is exactly the same one that was provided to all Secured Lenders in Class 1. See also, In re Washington Mutual, Inc., 442 B.R. 314, 362 (Bkrtcy.D.Del. 2011) (no discrimination under Section 1123(a)(4) where offer under Plan was made to all holders in the class even though holders electing to provide release received pro rata share of payment that holders electing not to did not receive).

The second reason that the Lone Dissenters' argument fails is that Section 1123(a)(4) includes an exception where the holders of particular claims agree to a less favorable treatment. Here, Huntington and Fifth Third assert that the outcome for them is different (which it is as a result of their choice) but have ignored the fact that the difference for the other Secured Lenders is that they have agreed to provide Exit Financing to the Debtors (as they emerge from bankruptcy) and their affiliates for a 3-year period and have thereby committed to advance tens of millions of dollars of new and additional funds. The consequences of this difference are

significant. The Exit Lenders commit to lend more and thereby incur a greater risk of non-payment. As Huntington and Fifth Third have each acknowledged by not opting to become Exit Lenders, the treatment of the Exit Lenders is less favorable because the amounts of the Exit Lenders' Pre-Petition claims that are repaid are subject to re-borrowing up to the amounts of the Exit Financing commitments and those amounts remain at risk for ultimate repayment. The Exit Financing Lenders, moreover, agree to <u>increase</u> the pro rata amount of their commitments to compensate for Huntington and Fifth Third not becoming Exit Lenders. Under the Plan, by virtue of their electing not to be Exit Lenders, Huntington and Fifth Third have avoided that commitment to lend and that risk. Therefore, even if the treatment provided to the holders of Class 1 were not regarded as being the same (which it is), the agreement of the other Secured Lenders to accept less favorable treatment as a result of their commitment to provide Exit Financing falls within the exception under Section 1123(a)(4).

**C.**   **<u>The Release Of The Debtors' And Their Debtor Affiliates' Claims Against The Secured Lenders Embedded In The Plan Is An Integral Component Of The Plan.</u>**

Section 1123(b)(3) of the Bankruptcy Code specifically provides that a plan "may provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate". 11 U.S.C. § 1123(b)(3)(A). Compromises are generally favored in bankruptcy. <u>Myers v. Martin (In re Martin)</u>, 91 F.3d 389 (3d Cir. 1996). The approval of a settlement is committed to the discretion of the bankruptcy court, <u>Key3Media Group Inc. v. Pulver.com Inc.</u>, 336 B.R. 87, 92 (Bankr. D. Del. 2005), which must determine whether "the compromise is fair, reasonable, and in the best interest of the estate." <u>In re Louise's Inc</u>., 211 B. R. 798, 801 (D.Del. 1997).

Debtors acknowledge that they have the burden of convincing the Court that the settlement in the Plan falls within the range of reasonableness. Key3Media Group, 336 B.R. at 93. ("While a court generally gives deference to the Debtors' business judgment in deciding whether to settle a matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved.") The Court does not have to be convinced that the settlement is the best possible compromise, but only that the settlement falls within a reasonable range of litigation possibilities. In re Coram Healthcare Corp., 315 B.R. 321, 330 (Bankr.D.Del. 2004) (finding that the proper test to apply in the determination of whether to approve a proposed compromise is if the compromise falls "within the reasonable range of litigation possibilities"). Therefore, the settlement need only be above "the lowest point in the range of reasonableness." Id. (citing Official Unsecured Creditors' Comm. of Pa. Truck Lines, Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.), 150 B.R. 595, 598 (E.D.Pa.1992)). When determining the best interests of the estate, the Court must balance the value to the estate of accepting the settlement against the claims that are being compromised. Martin, 91 F.3d at 393. In striking this balance, the Court should consider: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity, expense, and delay of the litigation involved; and (4) the paramount interest of the creditors.

A key and essential element of the Debtors' Plan is the settlement of claims held by the Debtors and their non-Debtor affiliates against the Secured Lenders. Under the Plan, the Debtors and their affiliates have agreed to settle and compromise their claims in exchange for a $12 million Offset Amount and have agreed to provide a release of such claims to all Secured Lenders receiving the treatment specified under Section 5.01(c) of the Plan for Class 1 creditors.

The terms of this settlement, including the release provided in exchange therefor, are a key and necessary element to the Plan for several reasons. One very basic and obvious reason is that none of the Secured Lenders would agree to provide Exit Financing without receiving a release of these claims from the Debtors and their non-Debtor affiliates. Another is that the Debtors and non-Debtor Borrowers have substantial claims in excess of $79 million and, while they are willing to compromise the claims in the context of a Plan, they have proposed in the Plan a $12 million Offset Amount in consideration of the substantial claims they are releasing. Negotiations culminated in the compromise amount of $12 million and the Debtors (and the non-Debtor Borrowers) have the legal right to offset that Offset Amount against the claims of the Secured Lenders, as the Plan provides.

The Lone Dissenters in effect object that they cannot be bound by the terms of the settlement or be forced to accept an offset to their claims for a pro rata portion of the Offset Amount. They argue, in effect, that although they are members of a syndicated lender group that has voted overwhelmingly to accept the settlement and the Plan, they cannot be forced over their objection to accept the terms of the settlement and have their claims reduced. The terms of the settlement are, however, in fact binding on all Secured Lenders including Huntington and Fifth Third.

Under Section 1141(a) of the Bankruptcy Code, the provisions of a confirmed plan bind the debtor and all creditors, whether or not the claim of that creditor is impaired under the plan and whether or not such creditor has accepted the plan. 11 U.S.C. § 1141(a). Huntington and Fifth Third are properly classified as members of Class 1 under the Plan, and the holders of claims in that Class have voted in the requisite number and amount to accept the terms and provisions of the Plan, inclusive of the Offset Amount. The acceptance of the Plan by the

Secured Lenders Class includes, by necessity, approval of the terms of the Offset Amount. Under Section 1141(a), confirmation of the Plan is binding on all members of the Class. For the reasons discussed, the Offset Amount is an essential term of the Plan and is binding on all creditors including Huntington and Fifth Third without regard to whether their claim is impaired thereby and without regard to whether they have voted against the Plan.

The terms of this settlement include a release not only by Debtors but by the non-Debtor Borrowers who also hold the claims that are being settled under the terms of the Plan. For logical reasons, the Secured Lenders agreeing to provide Exit Financing (which provides credit availability for both Debtors and non-Debtor Borrowers) will not agree to provide that financing if claims that could be asserted by non-Debtor Borrowers are not also released. Thus, a release from both Debtors and non-Debtors is required in order to obtain the necessary Exit Financing and in order to confirm the Plan. Accordingly, this Court can dismiss the objections of Huntington and Fifth Third and confirm the Plan and the terms of the Settlement Agreement will be binding on all Secured Lenders including Huntington and Fifth Third.

### D. The Injunctions Included In The Plan Are Reasonable And Necessary To The Implementation Of The Plan Including The Provisions That Enjoin The Pursuit Of Any Claims By Secured Lenders Against Non-Debtor Borrowers

The Lone Dissenters contend that the Plan improperly enjoins them, as Secured Lenders, from pursuit of claims against non-Debtor Borrowers. In effect, Huntington and Fifth Third are arguing that even if the Plan is binding on them and imposes a reduction in their claims for their pro rata share of the Offset Amount, they cannot be enjoined from collecting their claim (with or without reduction) from non-Debtor obligors as the Plan proposes. They also argue that the Plan improperly enjoins them from pursuing claims against other Secured Lenders.

The relevant language from the Plan is set forth in subsection 11.07(e) and the final sentence of Section 11.07, which read as follows:

A. Injunction. *Confirmation of this Plan shall have the effect of, among other things, permanently enjoining all Entities or Persons that have held, hold or may hold or have asserted, assert or may assert Claims against or Interests in the Estates with respect to any such Claim or Interest, from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan): ...*

*(e) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan including without limitation any action or proceeding against Borrowers, the Secured Lenders or any of them, that is inconsistent with the modifications to the Pre-Petition Credit Agreement approved pursuant to this Plan as summarized in Section 13.07 of the Plan.*

*In consideration of (x) the substantial contribution to the Plan made and to be made by Borrowers, including the non-Debtor Borrowers, through the delivery and grant of liens and mortgages on property of the non-Debtor Borrowers, (y) the agreement of the non-Debtor Borrowers to release claims against the Administrative Agent and Secured Lenders as set forth in Section 11.08 of this Plan, and (z) the agreement of the non-Debtor Borrowers to not demand or require repayment of inter-company receivables from Debtors, the injunction provided for in this Section 11.07 shall extend to and apply to all claims of Secured Lenders against non-Debtor Borrowers, and all Secured Lenders shall be precluded from taking any of the foregoing actions against the non-Debtor Borrowers except as to obligations of the Debtors and non-Debtor Borrowers under this Plan and agreements approved pursuant to this Plan.*

1.     **The Injunction Against Pursuit of Claims Against Non-Debtor Borrowers Is Fair, Reasonable and Necessary to the Plan.**

The injunction against pursuit of claims by the Secured Lenders against non-Debtor Borrowers is a necessary and reasonable element of the Plan, and the objections of the Lone Dissenters should be rejected. The Plan provision precluding an "end around" the Plan, of course, has been accepted by all other Secured Lenders and is binding on Class 1 holders pursuant to the approval of the Plan by that Class. Fundamentally, therefore, the injunction is necessary to carry out the Plan the Secured Lenders have already approved because the non-Debtor Borrowers are all co-borrowers with the Debtors under the same credit facility, including the pre-Petition Credit Agreement and the Exit Financing. If creditors of the Debtors are not

prevented from collecting claims against the non-Debtor Borrowers, or more to the point are permitted to pursue claims against non-Debtor Borrowers that are inconsistent with the Plan, the provisions of the Plan would be thwarted.

Debtors and non-Debtors borrow under a single common credit facility, and therefore recovery of claims by any Secured Lender from a non-Debtor Borrower would directly reduce the availability of funding under the Exit Financing and increase the liability of the Debtors since they remain co-Borrowers under the credit facility. It would have the same effect as collection directly from the Debtors on a basis inconsistent with the Plan, and therefore the injunction against pursuit of non-Debtor Borrowers is essential to Debtors' reorganization and to support the injunction against direct or indirect collection of claims against the Debtors except in accordance with the Plan. Plainly put, the injunction is necessary to prevent circumvention of the terms of the Plan.

The injunction here is supported by more than sufficient consideration. As set forth directly in Section 11.07 of the Plan, the non-Debtor Borrowers have provided substantial consideration in exchange for the injunction provisions. Specifically, the non-Debtor Borrowers have agreed to release their claims against the Secured Lenders as set forth in Section 11.08 of the Plan, the Debtors and non-Debtor Borrowers have agreed to the delivery and grant of liens and mortgages on their property in order to secure the Exit Financing, and the non-Debtor Borrowers have agreed not to demand or require repayment of any intercompany receivables from the Debtors.

Finally, the injunction is tailored to no more than is necessary to support the Plan. While all Secured Lenders including Huntington and Fifth Third are enjoined by the Plan from pursuing claims against the non-Debtor Borrowers that are inconsistent with the Plan, they are not

enjoined as to, and Section 11.07 specifically excepts, obligations that the Debtors and non-Debtor Borrowers have under the Plan and agreements approved pursuant to the Plan, *i.e.*, the modifications to the Pre-Petition Credit Agreement and the Exit Financing. Thus, since the non-Debtor Borrowers and Debtors remain obligors following confirmation of the Plan, no remedies for their failure to meet those obligations are enjoined. Similarly, the Plan modifies the pre-Petition Credit Agreement to extend the maturity date but the non-Debtor Borrowers remain obligated by the terms of the Credit Agreement, as modified, and the injunction does not preclude enforcement and pursuit of claims if the obligations continued by the Plan are not met or fulfilled.

Significantly, the Plan does not contain any <u>releases</u> of non-Debtors. In other words, the Plan does not release the non-Debtor Borrowers from any obligation but only narrowly enjoins actions against them to the extent that such actions are inconsistent with the Plan. <u>See</u>, <u>e.g.</u>, <u>In Re Safety Harbor Resort and Spa a/k/a S.H.S. Resort, LLC</u>, 2011 WL 3849639, No. 8:10 bk-25886 (Aug. 30, 2011) (Court declined to approve release of non-debtor guarantors but instead imposed injunction on any actions against them for period of post-confirmation financing). The Lone Dissenters argue that the injunction in the Plan against enforcement as to non-Debtor Borrowers is the effective equivalent of a release. The argument is misplaced for several reasons.

First, the reduction in the amount of the claims held by Huntington and Fifth Third does not occur as a result of any release of a non-Debtor Borrower or as a result of the injunction provisions under the Plan. It results from the application of the offset for a pro rata portion the Offset Amount. The claims settled by the Plan for the Offset Amount are primarily held by the

Debtors. The pre-Petition claims of all Secured Lenders are reduced by the amount of the Offset Amount whether collection is pursued against the Debtors or a non-Debtor Borrower.

Second, the provisions of the Plan effect no release of the Debtors or any non-Debtor Borrower with respect to their post-Confirmation obligations in accordance with the Plan, and the Plan imposes no injunction for failure to abide by post-Confirmation obligations. Section 11.07(e) of the Plan restricts "*any action or proceeding against Borrowers, the Secured Lenders or any of them, that is inconsistent with the modifications to the Pre-Petition Credit Agreement approved pursuant to this Plan as summarized in Section 13.07 of the Plan'.* The last sentence in Section 11.07 makes clear, however, that the injunction applies to non-Debtor Borrowers "*except as to obligations of the Debtors and non-Debtor Borrowers under this Plan and agreements approved pursuant to this Plan.*"

**2**. **The Injunction Against Pursuit of Claims Against the Secured Lenders Is Fair, Reasonable and Necessary to the Plan.**

Fifth Third also objects that the Plan contains overly broad releases because it enjoins actions against the Secured Lenders and against the Administrative Agent that are inconsistent with the Plan. The objection appears to be predicated on the assumption that the Debtors will pursue claims against the Secured Lenders as well as a complaint by Fifth Third that if it faces lender liability action from the Debtors, it will be unable to pursue claims over against the Administrative Agent. The objection is misplaced because the Plan settles and releases those claims.

Nevertheless, even if claims against Huntington and Fifth Third were not released and Debtors retained causes of action against them, the injunction against pursuit of claims against the Secured Lenders and Administrative Agent would be reasonable and necessary to the Plan. Debtors have agreed to settle their claims with the Secured Lenders and the Administrative

Agent, and receiving a release from such claims is a logical requirement for the Exit Financing Lenders to agree to provide the Exit Financing: it cannot be expected that these lenders will provide new financing to a borrower threatening claims against them. For this very common sense reason, courts generally have long recognized that they have the authority to bar claims of non-settling defendants against settling defendants including for contribution and indemnity. Denney v. Deutsche Bank AG, 443 F.3d 253, 273 (2d. Cir. 2006); Chao v. Slutsky, 2009 WL 3174711 (E.D.N.Y. 2009). "Indeed, it is unlikely that settlements could be reached without the ability to limit the liability of settling defendants through bar orders." Chao, at p. 4. See also Eichenholtz v. Brennan, 52 F.3d 478 (3d. Cir. 1995). Here, the Secured Lenders providing the Exit Financing will not agree to settle claims with the Debtors if they would nevertheless still face liability for the same matters and the same claims through assertions of claims for contribution or indemnity from other lenders such as Fifth Third or Huntington. The injunction is reasonable and necessary to the implementation of the Plan.

There is one additional matter that warrants mention in connection with this argument. In its objection, Fifth Third asserts that the provisions of the Plan would prevent Fifth Third from pursuing actions against Bank of America as Administrative Agent. What Fifth Third fails to advise the Court is that as a participant under the Credit Agreement, Fifth Third, like all the Secured Lenders, has already released the Administrative Agent for any actions taken by it under or in connection with the Credit Agreement except for the Agent's gross negligence or willful misconduct. Section 9.03 of the Credit Agreement, labeled "Exculpatory Provisions," specifically states that the Administrative Agent is not liable for any action taken or not taken by it in the absence of its own gross negligence or willful misconduct.

Fifth Third also raises a concern that if it were faced with lender liability litigation, from the Debtors and its affiliates, it would be unable to pursue any type of action against Bank of America. Fifth Third overlooks that in any such lender liability litigation, Debtors and their affiliates would be asserting damages resulting directly from the separate, independent conduct of Fifth Third and Huntington and not the actions of the Administrative Agent. Moreover, if faced with such litigation, Fifth Third could nevertheless defend the actions on the basis that the liability or damages occurred as a result of the conduct of others including the Administrative Agent without asserting any claims or causes of action against such parties. The point remains that the injunctions under the Plan are necessary and essential to the confirmation of the Plan but are narrowly tailored to insure that the terms and provisions of the Plan are not circumvented by claimants such as Huntington or Fifth Third seeking to recover from other parties amounts resolved, compromised and settled by the terms of the confirmed Plan.

3. **Even If Regarded as Releases, The Injunction Against Pursuit of Claims Against The Non-Debtor Borrowers and the Secured Lenders for Claims Inconsistent With the Plan Are Approvable Under Applicable Case Law.**

The final reason that the Lone Dissenters' argument fails is that even if the provisions of this Plan are treated as the functional equivalent of a release of the non-Debtor Borrowers or the Secured Lenders, such a release can be approved by this Court under the Bankruptcy Code in these circumstances. The validity of third-party or non-debtor releases, and the authority of Bankruptcy Courts to approve them as part of a confirmed plan, has been the subject of a number of decisions. In this Circuit, the key decision is In Re Continental Airlines, 203 F.3d 203 (3rd Cir. 2000). There, following a review of the decisions of other Courts of Appeals on this issue, the Third Circuit declined to impose a blanket rule prohibiting all third party releases or permanent injunctions of non-debtor obligations, but did identify three hallmarks of permissible

non-consensual releases: "fairness, necessity to the reorganization and specific factual findings to support these conclusions".

Subsequent decisions have developed a test or list of factors for the Court to consider when determining whether a third party release is permissible. The factors are as follows:

(1)     whether the third party who will be protected by the injunction or release has made an important contribution to the reorganization;

(2)     whether the requested injunctive relief or release is "essential" to the confirmation of the plan;

(3)     whether a large majority of the creditors in the case have approved the plan;

(4)     whether there is a close connection between the case against the third party and the case against the debtor; and

(5)     whether the plan provides for payment of substantially all the claims affected by the injunction or release.

In Re Saxby's Coffee Worldwide, 436 B.R. 331, 336 (Bankr. E.D. Pa. 2010).   Application of the foregoing factors shows that the factors are satisfied here as to both non-Debtor Borrowers and the Secured Lenders.

The Plan easily meets the first factor that the party to be protected has made an important contribution to the reorganization.  Fifth Third's assertion that there is no evidence that either the non-Debtor Borrowers or the Secured Lenders have made any contribution to the Plan is patently wrong.   Section 11.07 of the Plan, the provision of the Plan setting forth the injunctions provisions, specifically lists the contributions made by the non-Debtor Borrowers.  This includes the substantial contribution to the Plan made by their delivery and grant of liens and mortgages on property that are required for the Exit Financing to be effective, the agreement of the non-Debtor Borrowers to release their claims against the Secured Lenders (including Huntington and Fifth Third) to the extent that they receive the treatment provided for under Section 5.01(c) of the

Plan and the agreement of the non-Debtor Borrowers not to demand or require repayment of intercompany receivables from the Debtors. The contribution made by the non-Debtor Borrowers is both identified in the Plan and substantial. Similarly, the contribution made by the Secured Lenders benefiting from the injunction is clear. The Secured Lenders agree to settle and compromise claims asserted by the Debtors and their affiliates and agree to make the commitment for and assume the risk of the Exit Financing on the terms in the Plan.

The second factor is also met. The requested injunctive relief is essential to confirmation of the Plan since without the injunction, the Exit Financing would disappear and the Plan provisions would be directly circumvented by pursuit of claims against the non-Debtor Borrowers or against the Secured Lenders.

The third factor is whether a large majority of the creditors in the case have approved the Plan. That is overwhelmingly the case here.

The fourth factor is whether there is a close connection between the case against the third party and the case against the Debtor. Here, there is an identity of such claims. Any claims that Huntington or Fifth Third would assert against the non-Debtor Borrowers would be for collection of the exact same amounts due under the Pre-Petition Credit Agreement that are specifically addressed and resolved by the Plan. Their pursuit of claims the Secured Lenders or Administrative Agent would be for the same acts and damages that are released by the terms of the settlement made by Debtors and non-Debtor Borrowers under the Plan.

The fifth factor is whether the Plan provides for payment of substantially all the claims affected by the injunction or release. Here, the Plan provides for the payment in full of all Pre-Petition claims of all the Secured Lenders. The reduction in the payment of those amounts occurs as a result of the offset from the Offset Amount arising from Debtor and non-Debtor

affiliates' resolution of claims they hold against all Secured Lenders. Accordingly, for the foregoing reasons, even were the injunctions in this Plan deemed to be the equivalent of releases, they are permissible third party, non-debtor releases that this Court can approve in accordance with the Bankruptcy Code.

## E.    The Plan is Feasible.

Fifth Third objects that the Plan is not feasible, relying as explained in Debtors Response to Fifth Third's Objection to the Plan (Doc. No. 169) on a combination of denials about information that it has in its possession and dollar amounts that are either erroneous or massively overstated. The Plan is in fact feasible and Debtors will present evidence and testimony at the Confirmation Hearing refuting Fifth Third's suggestion that it is not. Debtors will show that, assuming the critical event of confirmation of the Plan occurs now and the Debtors and their affiliates receive the benefits made available through the Exit Financing and the IRS Stipulation (which are conditioned on confirmation), Debtors will be able to reorganize, meet their obligations under the Plan and continue to operate their businesses.

Section 1129(a)(11) requires that a Plan be feasible. As the Bankruptcy Court for the Eastern District of Pennsylvania recently explained in <u>In re South Canaan Cellular Investments, Inc</u>. 427 B.R. 44 (Bkrtcy.E.D.Pa. 2010):

> Section 1129(a)(11) codifies the feasibility requirement and requires that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the plan. 11 U.S.C. § 1129(a)(11). To allow confirmation, the bankruptcy court must make a specific finding that the plan as proposed is feasible .... The standard of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence....
>
> In determining whether a debtor's Chapter 11 plan of reorganization is feasible, … "the [bankruptcy] court need not require a guarantee of success ... [o]nly a reasonable assurance of commercial viability is required." All the bankruptcy court must find is that the plan offer "a reasonable probability of success." <u>In re</u>

Landing Assoc., Ltd., 157 B.R. 791, 820 (Bankr.W.D.Tex.1993). _Matter of T–H New Orleans Ltd. Partnership_, 116 F.3d 790, 801 (5th Cir.1997) (citations omitted); *see generally* In re Continental Airlines, 91 F.3d 553, 563 (3d Cir.1996).

A key element of feasibility is whether there exists the reasonable probability that the provisions of the plan can be performed. "The purpose of the feasibility test is to protect against entirely speculative plans. However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility. The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds since a guarantee of the future is not required." In re Cajun Elec. Power Co-op., Inc., 230 B.R. 715 (Bkrtcy.M.D.La., 1999). Thus, while Debtors have the burden of demonstrating feasibility, they do not have to guarantee the success of Debtors' future operations any more than any other company not in bankruptcy could provide absolute assurances about its future performance.

"A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable.... The prospect of financial uncertainty does not defeat plan confirmation on feasibility grounds since a guarantee of the future is not required.... The mere potential for failure of the plan is insufficient to disprove feasibility." In re Patrician St. Joseph Partners Ltd. P'ship, 169 B.R. 669, 674 (D.Ariz. 1994). In order to determine whether Section 1129(a)(11) is satisfied, a court must "scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable." In re Sagewood Manor Assocs. Ltd. P'ship., 223 B.R. 756, 762 (Bankr.D.Nev. 1998). See also, Clarkson v. Cooke Sales & Serv. Co. ( In re Clarkson ), 767 F.2d 417, 420 (8th Cir.1985) ("the feasibility test contemplates 'the probability of actual performance of the provisions of the plan.... The test is whether the things which are to be done after confirmation can be done as a practical matter....' "); In re Jartran, Inc., 44 B.R. 331, 393 (Bkrtcy.N.D.Ill. 1984) ("The touchstone of feasibility is whether or nor the Debtor emerges from

reorganization with reasonable prospects of financial stability and success, and in particular the ability to meet the requirements for capital expenses."; <u>In re Briscoe Enter., Ltd., II</u>, 994 F.2d 1160, 1165-66 (5th Cir. 1993) ("the [bankruptcy] court need not require a guarantee of success ..., [o]nly a reasonable assurance of commercial viability is required."); <u>In re Landing Assoc., Ltd.</u>, 157 B.R. 791, 820 (Bankr.W.D.Tex. 1993) (All the bankruptcy court must find is that the plan offers "a reasonable probability of success."). The evidence that Debtors will introduce at the Confirmation hearing will show that, <u>provided</u> their Plan is confirmed now, they and their affiliated entities are commercially viable, will meet the terms of the Plan and have an excellent prospect of succeeding in their businesses.

> **F.** **Debtors Are Able to Demonstrate That The Lone Dissenters Fair Better Under the Plan than Under a Hypothetical Chapter 7 Liquidation and The Plan Meets 11 U.S.C. § 1129(a)(7).**

Debtors admit that they have the burden of demonstrating under Section 1129(a)(7) that Fifth Third's and Huntington's treatment under the Plan will be better than their recovery in a hypothetical liquidation. As indicated above, prior to the voting deadline Debtors explained in detail to Fifth Third in a meeting with its representatives that all Secured Lenders, no matter which option selected, would fair far better under the Plan than under a hypothetical Chapter 7 liquidation.

Debtors have the burden of showing that the Plan meets the "best interest" test by a preponderance of the evidence. <u>See</u>, <u>e.g.</u>, <u>In re Adelphia Commc'ns Corp.</u>, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) (finding that the plan proponent has the burden of proof in establishing by a preponderance of evidence that its plan meets the best interest of creditors test). Section 1129(a)(7) requires a determination of whether "a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization." <u>In re</u>

Lason, Inc., 300 B.R. 227, 231 (Bkrtcy.D.Del. 2003). The proponent of the plan bears the burden of showing that the best interest of creditors has been satisfied. In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr.D.Del. 2001) (citations omitted).

Applying the "best interests" test, as one court has said, requires one "to conjure up a hypothetical chapter 7 liquidation that would be conducted on the effective date of the plan.". In re Sierra-Cal, 210 B.R. 168 (Bkrtcy.E.D.Cal. 1997):

> The hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7. It contemplates valuation according to the depressed prices that one typically receives in distress sales. 7 COLLIER ¶ 1129.03[7] [b][iii]. It requires estimation of disputed and contingent claims and of chapter 7 administrative expenses. *Id.* And it requires application of the chapter 7 distribution scheme that would be applied in a chapter 7 liquidation. M. Long Arabians, 103 B.R. at 216–17.

Contrary to Fifth Third's contention, the Debtors' analysis and the evidence presented at the Confirmation Hearing will show that all Secured Lenders fair better under the Plan than in a hypothetical liquidation and will extend not only to the Debtors themselves but to the non-Debtor affiliates as well and to all available assets -- encumbered and unencumbered.

**G.      The Plan Meets 11 U.S.C. § 1129(a)(4) And The Offset Amount Is Not An "Unreasonable Fee" As Fifth Third Contends.**

In this objection, Fifth Third tries to re-designate the Offset Amount agreed to as a compromise of claims as a "fee" for the Exit Financing facility, and then argues that the "fee" is unreasonable. While the Debtors have said that one element supporting its waiver of the Offset Amount is the willingness of a sufficient number of Secured Lenders to accept the burden and risk of further lending (and even to increase their pro rata share of loans), that hardly equates to paying a "$12 million fee." There is no basis in fact or in law for this objection, and it should be overruled.

**H.** **The Plan Does Not Violate 11 U.S.C. § 1129(b)(2) Or The "Absolute Priority" Rule Invoked By Fifth Third Because The Rule Codified In The Statute Applies Only To *Unsecured* Claims Not Secured Claims Such As Those Held By Fifth Third.**

Fifth Third's next objection to the Plan is that it violates the "absolute priority" rule codified in Section 1129(b)(2). Section 1129(b)(2) requires that a plan be "fair and equitable" and sets forth various rules applicable to classes of secured claims, classes of unsecured claims and classes of interest. The rule Fifth Third seeks to invoke is that a "dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under the plan." (See Fifth Third's Objection to Plan at ¶61, p. 19).

The argument is entirely misplaced. The rule Fifth Third cites applies to <u>unsecured</u> creditors, not secured creditors such as Fifth Third. But, the Plan provides for the payment in full of all unsecured creditors and no member of the General Unsecured creditors class (Class 4) has filed any objection. The rule Fifth Third relies upon is simply inapplicable. An identical argument was rejected recently by the Bankruptcy Court for the District of Arizona in <u>In Re Linda Vista Cinemas LLC</u>, 442 B.R. 724, 753 (Bkrtcy. D. Ariz. 2010) (emphasis in original), where the Court said as follows:

> This is because the statute expressly contains the solitary expression of this [absolute priority] rule in the section that <u>only</u> deals with <u>unsecured</u> creditors. Section 1129(b)(2)(B)(ii). The absolute priority rule must not be violated if the <u>unsecured</u> creditors object, which they have not. In fact, the unsecured creditor class has voted in <u>favor</u> of the Plan. And importantly, because the Plan calls for full payment plus interest to the principal unsecured class, the rule is not violated.

Other Bankruptcy Courts have similarly held that the absolute priority rule invoked by Fifth Third does not apply to secured creditors classes, which have no standing to raise the objection. See <u>In Re Ardin Props., Inc.</u>, 248 B.R. 164, 173-74 (Bankr. D. Ariz. 2000) ("The

absolute priority rule applies only to unsecured classes, not to secured claims requirements for which are separately set forth in Section 1129(b)(2)(A), which says nothing about the timing of the repayment nor any comparison to the treatment of other classes."); In Re Cypresswood Land Partners One, 409 B. R. 396, 437 (Bankr. S.D. Tex. 2009) (secured creditor lacked standing to object to the plan violated the absolute priority rule).  Finally, even were the Class 1 claims able to access the "absolute priority rule," the attempt would be for naught since Class 1 is <u>not</u> a dissenting class.

The Court should overrule this objection.

## I.      <u>The Plan is Proposed in Good Faith.</u>

The Lone Dissenters object that the Plan was not proposed in good faith.  This objection is in reality an amalgamation of their other meritless objections refuted above: that is, they argue that the Plan was not proposed in good faith because it contains overly broad releases or violates the "absolute priority" rule or fails to "bifurcate" their claims.  Since those arguments are individually invalid they do not collectively indicate a lack of good faith.

The bankruptcy definition most commonly applied is that the good faith which is needed to confirm a plan of reorganization requires the plan to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.  In re Sylmar Plaza, L.P., 314 F.3d 1070, 1074 (9th Cir. 2002) (citing In re Corey, 892 F.2d 829, 835 (9th Cir.1989)); In re Stolrow's, Inc., 84 B.R. 167, 172 (9th Cir. BAP 1988); In re Jorgensen, 66 B.R. 104, 108–09 (9th Cir. BAP 1986). In order to determine good faith, a court must inquire into the totality of circumstances surrounding the plan, the application of the principles of fundamental fairness in dealing with creditors, and then decide whether the plan will fairly achieve a result consistent with the objectives and purposes of the Code.  Sylmar Plaza, 314 F.3d at 1074; Stolrow's, 84 B.R. at 172;

Jorgensen, 66 B.R. at 109; see also In re Kemp, 134 B.R. 413, 414–15 (Bankr. E.D.Cal. 1991);

In re Jasik, 727 F.2d 1379, 1383 (5th Cir. 1984).

The good faith of the Debtors' Plan is demonstrated by this simple rubric: if the Plan had merely proposed that the creditors in Class 1 receive a pro rata reduction of $12 million on their claims and that Debtors will waive the reduction if the holder agrees to provide exit financing, without any explanation at all for the amount of the reduction or without proposing a resolution and settlement of claims, and the Class voted in favor of the Plan with the requisite number and amount, the vote of the Class would be binding and the Plan confirmable. That the Debtors here have addressed existing claims and causes of action, provided an explanation and a release and proposed a Plan that is fair and equal in its treatment of similarly situated creditors is a measure of its good faith, not an indication of bad faith as the Lone Dissenters would contend. As Fifth Third concedes in its Objection, "more than mere innuendo and speculation is needed to establish a lack of good faith." Washington Mutual, 422 B.R. at 364.

As for the argument that the Plan effects changes in credit terms without compliance with the Credit Agreement, the answer is demonstrably that such changes are effected by the vote of the Class and the provisions of the Bankruptcy Code, which trump the Credit Agreement, and that happens everyday.

**J.**      **Fifth Third's Argument That It Is Being Denied An Ability To Make An Election Under 11 U.S.C. § 1111(b) Should Be Overruled Because The Election Under Section 1111(b) Belongs Only To The Class Not An Individual Claimholder.**

For its final objection, Fifth Third quotes the language of 11 U.S.C. § 1111(b) and then, notwithstanding what the provision actually says, objects that Fifth Third is being deprived of its ability to make an election under Section 1111(b). The election under this Section belongs to a class of creditors not any individual holder. The language of Section 1111(b)(1)(A)(i) clearly

states that it allows an election to be made if the "class of which such claim as a part elects, by at least two-thirds in amount and more than half in number of allowed claims of such class." (Emphasis added). The class of Secured Lenders (Class 1) has made no such election and in fact has by the requisite number and amount voted to accept the Plan.[5] This objection should be overruled.

## VIII. CONCLUSION

For the foregoing reasons and based upon the evidence and testimony to presented to the Court at the Confirmation hearing on October 28, 2011, Debtors respectfully request the Court to approve the Joint Disclosure Statement and to confirm the Joint Plan of Reorganization dated August 12, 2011.

Respectfully submitted,

_/s/ Joseph F. McDonough_
Joseph F. McDonough, Esquire
jmcdonough@mmlpc.com
PA ID No. 19853
James G. McLean, Esquire
jmclean@mmlpc.com
PA ID No. 37463

Manion McDonough & Lucas, P.C.
Firm ID No. 786
600 Grant Street, Suite 1414
Pittsburgh, PA 15219
(412-232-0200)
October 25, 2011                    Counsel to Debtors

---

[5] Fifth Third's argument is also confusing because it is predicated on Fifth Third's perplexing complaint that the ability to make an election under Section 1111(b) was "stripped from" it because Debtors refused to give Fifth Third a "bifurcated claim." The reference to a "bifurcated claim" into secured and unsecured portions is puzzling since it is entirely at odds with Fifth Third's statements elsewhere that it is fully secured.